[No. S020854. Dec. 24, 1992.]

BRADLEY J. CLARK, as Registrar of Voters, etc., Plaintiff, Cross-defendant, and Respondent, v.
WILLIAM B. BURLEIGH, Defendant, Cross-complainant, and Appellant;
RICHARD M. SILVER, Defendant and Respondent.

COUNSEL

David W. Brown for Defendant, Cross-complainant and Appellant.

Ralph R. Kuchler and Douglas C. Holland, County Counsel, Albert H. Maldonado and Leroy W. Blankenship, Deputy County Counsel, for Plaintiff, Cross-defendant and Respondent.

No appearance for Defendant and Respondent.

OPINION

MOSK, J.—We review the constitutionality of a section of the Elections Code (§ 10012.1) that prescribes the content of a statutory "candidate's statement" that a candidate for local judicial office may prepare and file for inclusion in the voter's pamphlet. The statute provides that such a statement must be limited to the candidate's name, age, occupation, and a brief description of the candidate's own background and qualifications, and must not refer to those of other candidates for the office. As will appear, we conclude that the statute violates neither the free speech guaranty of the First Amendment nor the Fourteenth Amendment's guaranty of equal protection of the laws.

I

The Elections Code prescribes the content and manner of preparation and distribution of ballots and related election materials. Thus at least 10 but not more than 40 days before an election the county clerk must mail each voter a sample ballot essentially identical to the ballot that will be used in the ensuing election. (Elec. Code, §§ 10007, 10010.)[1] If a local initiative or referendum appears on the ballot, the clerk must mail with the sample ballot an analysis of the measure by public counsel and any written arguments submitted for or against the measure, and may also mail a copy of its text. (See §§ 3781, 3783 [county measures]; §§ 4015, 5011, and 5013 [city measures]; §§ 5156.5, 5157 [district measures].) All the foregoing documents are customarily transmitted to the voters in a single publication called the "voter's pamphlet."[2]

In addition, if a local, nonpartisan elective office appears on the ballot— i.e., a legislative, executive, or judicial office in the government of a county,

---

[1] All statutory references hereafter are to the Elections Code.

[2] The pamphlet may contain additional information that the local election officials deem useful to the voters. For example, the voter's pamphlet prepared for the November 3, 1992, municipal election in the City and County of San Francisco also contained the location of

a city, or a district—the clerk will provide a form on which any candidate for that office may prepare and file a "candidate's statement." (§ 10012.) Filing such a statement is wholly optional; but if the candidate chooses to file a statement—and if it otherwise complies with the statute—the clerk will include it in the voter's pamphlet. (*Ibid.*)

Section 10012 prescribes the general rules that govern the statutory "candidate's statements." In such a statement the candidate is permitted to give only his or her name, age, occupation, and "a brief description . . . of the candidate's education and qualifications" in no more than 200 words. (§ 10012.)[3] The statute prescribes strict deadlines for filing such a statement, and provides that after it is filed the statement may be withdrawn but may not be changed.[4] When they appear in the voter's pamphlet such candidates' statements must be printed "in type of uniform size and darkness, and with uniform spacing." (§ 10012.) And the statute authorizes the local agency to require each candidate filing such a statement to pay in advance his or her estimated pro rata share of the cost of printing and mailing the statement, as a condition of including it in the voter's pamphlet.[5]

Section 10012.1—the statute here in issue—further refines these requirements in the context of a nonpartisan election for a local *judicial* office. It provides in its entirety: "In addition to the restrictions set forth in Section 10012, any candidate's statement submitted pursuant to Section 10012 by a candidate for judicial office shall be limited to a recitation of the candidate's own personal background and qualifications and shall not in any way make reference to other candidates for judicial office or to another candidate's qualifications, character, or activities. The clerk shall not cause to be printed or circulated any statement which the clerk determines is not so limited or which includes any such references."

---

each voter's polling place, a summary of each ballot measure in Spanish and Chinese, definitions of important words and phrases used in the pamphlet, a "polling place card" for the voter to mark his or her choices in advance and thus expedite the casting of ballots, instructions on how to use the punch-card voting devices, a statement of the rights of voters in general and of disabled voters in particular, and application forms to obtain an absentee ballot, to qualify for permanent absentee voter status, and to serve as a poll worker.

The "voter's pamphlet" is to be distinguished from the "ballot pamphlet." The latter is a publication prepared and mailed by the Secretary of State rather than the individual county clerks, and primarily contains the text of statewide rather than local initiatives or referenda, together with an analysis thereof by the Legislative Analyst and arguments for and against such measures. (§§ 3567.5-3579.) It does not contain candidates' statements.

[3]The local agency may extend that limit to 400 words.
[4]The statement also remains confidential until the filing deadline has passed. (§ 10012.7.)
[5]The local agency will waive such payment on a showing of indigence. (§ 10012.3.)

## II

In conjunction with the June 1990 statewide primary election, an election was scheduled in Monterey County to fill office No. 2 of the Monterey Superior Court. The incumbent in that office, Superior Court Judge Richard M. Silver, filed for reelection. A municipal court judge, Judge William B. Burleigh, sought election to the same office, and filed his candidate's statement under section 10012.1. Contrary to the restrictions laid down by that section, however, Judge Burleigh devoted the bulk of his candidate's statement to an attack on Judge Silver. Thus, Judge Burleigh expressly referred to Judge Silver by name three times, characterized him as a "Jerry Brown appointee," and stated that "I am greatly disturbed by his decisions." In particular, Judge Burleigh charged that *"Criminal activity is being dismissed.* Innocent citizens have had their lives and businesses disrupted by court *interference."* (Italics in original.) As only *"Some* Examples" of the foregoing, Judge Burleigh then referred to three cases assertedly decided by Judge Silver. (Italics in original.) He emphasized that in the first such case Judge Silver *"dismissed"* a narcotics charge after a police seizure, in the second case Judge Silver found *"no malice"* in a stabbing resulting from a fight, and in the third case Judge Silver ordered a supermarket to *"remain open"* after it announced it would close. (Italics in original.) Judge Burleigh concluded that "It's time to get *tough with criminals . . .* time to end court *interference* in community affairs." (Italics in original.)[6]

The Monterey County Registrar of Voters (hereafter the registrar) is authorized by section 10012.1 to determine whether any candidate's statement filed in a Monterey County election violates that statute. Rather than so determining in the case at bar, however, the registrar filed this action for declaratory relief (Code Civ. Proc., § 1060), seeking a judicial determination whether Judge Burleigh's candidate's statement violated section 10012.1, and, if so, whether the statute is constitutional. In response, Judge Burleigh filed a cross-petition for writ of mandate (§ 10015) to compel the registrar to publish his statement as written. In his pleadings Judge Burleigh conceded that his statement made reference to Judge Silver and his qualifications in express violation of section 10012.1; he contended, however, that the statute is unconstitutional on its face because it infringes on his rights to freedom of speech and equal protection of the laws.

After a hearing the trial court found that Judge Burleigh's candidate's statement violated section 10012.1; and after a review of the case law the court concluded that section 10012.1 does not contravene the guaranties of either free speech or equal protection. The court therefore denied Judge

---

[6]Judge Burleigh's statement is set forth in full in the appendix.

Burleigh's petition for writ of mandate. The court nevertheless declined to strike Judge Burleigh's entire statement; instead, exercising its general equitable powers, the court struck from the statement only the references to Judge Silver[7] and directed the registrar to print the remainder in the voter's pamphlet.

Judge Burleigh appealed. In a divided decision the Court of Appeal reversed the judgment, holding section 10012.1 unconstitutional on the ground that the statute violates the free speech guaranty of the First Amendment. The Court of Appeal did not reach the equal protection issue. For the reasons that follow, we will hold that section 10012.1 does not violate either the First Amendment or the equal protection guaranty, and hence will affirm the judgment.

## III

We begin with three preliminary points.

First, although the election in question has now been held, we do not deem the matter moot. Rather, we will address the issues on their merits because they are of general public interest and likely to recur. (*Meyer* v. *Grant* (1986) 486 U.S. 414, 417-418, fn. 2 [100 L.Ed.2d 425, 432-433, 108 S.Ct. 1886]; *Unger* v. *Superior Court* (1984) 37 Cal.3d 612, 614 [209 Cal.Rptr. 474, 692 P.2d 238], and cases cited.)

Second, there is no doubt that when as here the facts are not in dispute, an action for declaratory relief is a proper vehicle for challenging the constitutionality of a statute. (*Steffel* v. *Thompson* (1974) 415 U.S. 452 [39 L.Ed.2d 505, 94 S.Ct. 1209]; see, e.g., *Meyer* v. *Grant, supra,* 486 U.S. 414; *Abbott* v. *City of Los Angeles* (1960) 53 Cal.2d 674, 678, fn. 2 [3 Cal.Rptr. 158, 349 P.2d 974, 82 A.L.R.2d 385], and cases cited.)

Third, in his pleadings Judge Burleigh alleged generally that section 10012.1 violates both federal "and state" constitutional guaranties. In his briefs in this court, however, he relies exclusively on the First Amendment to the federal Constitution, and fails to make or support any contention that the statute contravenes any provision of the California Constitution; indeed, he nowhere even mentions our fundamental charter. In oral argument before this court counsel for Judge Burleigh did make passing reference to the California Constitution, but again failed to explain how the statute violates

---

[7]Specifically, the court struck the portion of the statement beginning with the words "(Jerry Brown appointee)" and ending with the sentence, "Silver ordered Safeway to remain open." (See appen.)

any provision of that document. We decline to address such a pro forma claim. (See *Troensegaard* v. *Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 228 [220 Cal.Rptr. 712]; *Sprague* v. *Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1050 [213 Cal.Rptr. 69]; *Henderson* v. *Security Nat. Bank* (1977) 72 Cal.App.3d 764, 769 [140 Cal.Rptr. 388], and cases cited.)

We turn to the merits of the appeal. ██ "To assess the constitutionality of a state election law, we first examine whether it burdens rights protected by the First and Fourteenth Amendments." (*Eu* v. *San Francisco Democratic Comm.* (1989) 489 U.S. 214, 222 [103 L.Ed.2d 271, 281-282, 109 S.Ct. 1013].) ██ The statute here challenged, section 10012.1, limits what a candidate for local judicial office may say in his or her candidate's statement distributed to the electorate in the voter's pamphlet. It therefore implicates the candidate's First Amendment rights, for the amendment " 'has its fullest and most urgent application' " to political speech. (*Id.* at p. 223 [103 L.Ed.2d at p. 288], and cases cited.)

Yet our determination that the candidate's statement "is protected speech merely begins our inquiry. ██ Even protected speech is not equally permissible in all places and at all times. Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities. [Citation.] Recognizing that the Government, 'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated,' [citation], the Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes. Accordingly, the extent to which the Government can control access depends on the nature of the relevant forum." (*Cornelius* v. *NAACP Legal Defense & Ed. Fund* (1985) 473 U.S. 788, 799-800 [87 L.Ed.2d 567-579, 105 S.Ct. 3439] [hereafter *Cornelius*].)

For purposes of such forum analysis the high court has divided all public property into three categories. The first is the traditional public forum—i.e., a place that by long tradition has been used by the public at large for the free exchange of ideas. "Public streets and parks fall into this category." (*Cornelius, supra,* 473 U.S. at p. 802 [87 L.Ed.2d at pp. 579-580].) Indeed, public streets and parks may be the only places that the high court has yet recognized as "traditional public forums." (See, e.g, *Ward* v. *Rock Against Racism* (1989) 491 U.S. 781, 790-791 [105 L.Ed.2d 661, 674-675, 109 S.Ct. 2746] [public park]; *Frisby* v. *Schultz* (1988) 487 U.S. 474, 481 [101 L.Ed.2d

420, 429-430, 108 S.Ct. 2495] [public street]; *Boos* v. *Barry* (1988) 485 U.S. 312, 318 [99 L.Ed.2d 333, 342-343, 108 S.Ct. 1157] [same]; *United States* v. *Grace* (1983) 461 U.S. 171, 178-180 [75 L.Ed.2d 736, 744-746, 103 S.Ct. 1702] [same].) Laws regulating the content of speech in such forums are subject to strict scrutiny: "Because a principal purpose of traditional public fora is the free exchange of ideas, speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." (*Cornelius, supra*, 473 U.S. at p. 800 [87 L.Ed.2d at pp. 578-579].)

"The second category of public property is the designated public forum, whether of a limited or unlimited character—property that the state has opened for expressive activity by part or all of the public." (*Intern. Soc. for Krishna Consciousness* v. *Lee* (1992) 505 U.S. __, __ [120 L.Ed.2d 541, 550, 112 S.Ct. 2701, 2705] [hereafter *ISKCON*].) As will appear, there are few examples of designated public forums in Supreme Court jurisprudence because the court has rarely—and not at all in the past decade—placed any property in this category.[8] A content-based regulation of speech in a designated public forum is subject to strict scrutiny: "Regulation of such property is subject to the same limitations as that governing a traditional public forum." (*Ibid.*)

"Finally, there is all remaining public property" (*ISKCON, supra*, 505 U.S. at p. __ [120 L.Ed.2d at p. 550, 112 S.Ct. at p. 2705]), a category usually referred to as the "nonpublic forum."[9] "Limitations on expressive activity conducted on this last category of property must survive only a much more limited review. The challenged regulation need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view." (*Id.* at p. __ [120 L.Ed.2d at pp. 549, 551, 112 S.Ct. at pp. 2705-2706].)

---

[8]Courts and commentators have also referred to this category as the "limited public forum." The phrase currently used by the high court—"designated public forum" or "public forum by designation"—is more accurate because it allows for the possibility of a nontraditional public forum that, like a traditional public forum, is not limited by speaker or subject matter. It is unclear, however, whether the high court has yet found an example of such a forum. (See fn. 12, *post.*)

[9]Although it may be convenient shorthand, the phrase "nonpublic forum" is somewhat misleading. Property in this category is not "nonpublic" in the sense that it is privately owned; it remains at all times public property either owned or controlled by the government. Nor is the property a "forum" in the sense of a meeting place or medium for open discussion; on the contrary, it is precisely because it is not such a meeting place or medium that the government can lawfully close it to such discussion. In short, a "nonpublic forum" is simply public property that is not a public forum by tradition or design. As Justice Kennedy correctly described the category in his concurring opinion in *ISKCON, supra*, "All other types of property are, in the Court's view, nonpublic forums (*in other words, not public forums*) . . . ." (505 U.S. at p. __ [120 L.Ed.2d at p. 560, 112 S.Ct. at p. 2716] (conc. opn. of Kennedy, J., italics added).) We use the phrase herein with that understanding.

■ To apply the public forum doctrine a court proceeds in a series of steps. In step one the court defines the "forum" by deciding whether the forum is the entire property to which access is sought or only a portion of that property. In step two the court decides whether the forum thus defined is a traditional "public forum," a "designated public forum," or a "nonpublic forum." If it is either of the first two kinds of forums, in step three the court decides whether the challenged law restricts the content of speech in that forum or only its time, place, or manner. And in step four the court tests the challenged law by the standard that governs both the class of forum it has selected in step two and, if relevant, the type of speech restriction it has identified in step three.

We begin with step one. (See *Cornelius, supra,* 473 U.S. at p. 800 [87 L.Ed.2d at pp. 578-579].) Here the Court of Appeal held that the relevant forum is the voter's pamphlet. ■ We believe, rather, that the forum is not the voter's pamphlet as a whole but simply the candidate's statement. "Although . . . as an initial matter a speaker must seek access to public property [here, the voter's pamphlet] . . . to evoke First Amendment concerns, forum analysis is not completed merely by identifying the government *property* at issue. Rather, in defining the forum we have focused on the *access* sought by the speaker. ■ When speakers seek *general* access to public property, the forum encompasses that property. See, *e.g., Greer* v. *Spock* [(1976) 424 U.S. 828 [47 L.Ed.2d 505, 9 S.Ct. 1211] (speakers sought access to entire military base)]. In cases in which *limited* access is sought, our cases have taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property." (*Cornelius, supra,* 473 U.S. at p. 801 [87 L.Ed.2d at p. 579], italics added.)

Thus, in *Lehman* v. *City of Shaker Heights* (1974) 418 U.S. 298 [41 L.Ed.2d 770, 94 S.Ct. 2714], the speaker sought to compel the city to permit his political advertising on city-owned buses, but the high court defined the forum as the specific advertising placards mounted inside the buses. (Cf. *Wirta* v. *Alameda-Contra Costa Transit Dist.* (1968) 68 Cal.2d 51, 55 [64 Cal.Rptr. 430, 434 P.2d 982].) In *Perry Ed. Assn.* v. *Perry Local Educators' Assn.* (1983) 460 U.S. 37 [74 L.Ed.2d 794, 103 S.Ct. 948] (hereafter *Perry*), the speakers sought access to teachers' mailboxes and an interschool delivery system; the court so defined the forum, notwithstanding that the system lacked a physical situs. In *City Council* v. *Taxpayers for Vincent* (1984) 466 U.S. 789, 813-815 [80 L.Ed.2d 772, 792-794, 104 S.Ct. 2118], the speaker sought to compel the city to permit his political advertising on utility poles located on public sidewalks; the court defined the forum as the poles, which were privately owned, rather than the sidewalks. And in *Cornelius, supra,* 473 U.S. at pages 800-802 [87 L.Ed.2d at pages 578-580], the speakers

sought to participate in an annual charity drive aimed at federal employees in their places of work; although the government contended that the only "property" involved was therefore the federal workplace, the court defined the forum more narrowly as the particular charity drive to which access was sought.

We apply this reasoning to the case at bar. To publish his material critical of Judge Silver, Judge Burleigh did not seek access to the voter's pamphlet as a whole but only to the specific portion of that pamphlet represented by his candidate's statement. He simply had no interest in any other portions of the pamphlet. Because Judge Burleigh thus sought only a "limited access," we take the "more tailored approach" of *Cornelius, supra,* 473 U.S. at page 801 [87 L.Ed.2d at page 579], and conclude that the precise forum in issue here is the candidate's statement itself.

 "Having defined the relevant forum, we must then determine whether it is public or nonpublic in nature." (*Cornelius, supra,* 473 U.S. at p. 800 [87 L.Ed.2d at pp. 578-579].) Because the candidate's statement is a creature of recent legislation,[10] it is obviously not a traditional public forum. The question is whether it is a designated public forum. The answer will be found in an analysis of the Legislature's intent.

"The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by *intentionally* opening a nontraditional forum for public discourse. [Citation.] Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." (*Cornelius, supra,* 473 U.S. at p. 802 [87 L.Ed.2d at pp. 579-580], italics added.)

The high court has applied this analysis in a number of cases in which the parties urged that a nontraditional forum was a designated public forum because it was used for the communication of certain information or ideas. In all but two of these cases the court has held that despite such communication neither the policy nor practice of the government was consistent with an intent to open the premises for expressive activity in general, and hence the property was a nonpublic forum. We shall review only the recent leading cases in point; they cite and discuss the earlier decisions.

In *Perry, supra,* 460 U.S. 37, a school district granted exclusive access to teachers' mailboxes and an interschool delivery system to a union that was

---

[10]Section 10012 was adopted in 1965 as former section 10012.5, and has often been amended; section 10012.1 was added in 1980.

the sole bargaining agent for its teachers. A rival union sought access, contending that the school mail facilities had become a limited public forum primarily because the district had allowed them also to be used by outside groups such as the YMCA, Cub Scouts, and other civic and church organizations.

The high court rejected the contention, reasoning that "If by policy or by practice the Perry School District has opened its mail system for indiscriminate use by the general public, then [the excluded union] could justifiably argue a public forum has been created. This, however, is not the case. As the case comes before us, there is no indication in the record that the school mailboxes and interschool delivery system are open for use by the general public. Permission to use the system to communicate with teachers must be secured from the individual building principal. There is no court finding or evidence in the record which demonstrates that this permission has been granted as a matter of course to all who seek to distribute material." (*Perry*, *supra*, 460 U.S. at p. 47 [74 L.Ed.2d at pp. 805-506].) With regard to use of the system by certain outside groups, the court declared that "This type of selective access does not transform government property into a public forum." (*Ibid.*)

In *Cornelius*, *supra*, 473 U.S. 788, government officials excluded legal defense and political advocacy organizations from participation in an annual charity drive (the CFC) aimed at federal employees in the workplace. The excluded organizations sought access, contending that by allowing certain charitable organizations to participate in the CFC the government had created a limited public forum for use by all such organizations to solicit funds in the federal workplace. The high court rejected the contention, reasoning that "neither [the government's] practice nor its policy is consistent with an intent to designate the CFC as a public forum open to all tax-exempt organizations." (*Id.* at p. 804 [87 L.Ed.2d at p. 581].) The court noted that although 850,000 organizations qualified for tax-exempt status in the year in question, only 237 had been allowed to participate in the CFC in the Washington, D.C., area. "The Government's consistent policy has been to limit participation in the CFC to 'appropriate' voluntary agencies and to require agencies seeking admission to obtain permission from federal and local Campaign officials. Although the record does not show how many organizations have been denied permission throughout the 24-year history of the CFC, there is no evidence suggesting that the granting of the requisite permission is merely ministerial." (*Ibid.*) Rather, the authorities in charge of the CFC "developed extensive admission criteria to limit access to the Campaign to those organizations considered appropriate. [Citation.] Such selective access, unsupported by evidence of a purposeful designation for

public use, does not create a public forum." (*Id.* at pp. 804-805 [87 L.Ed.2d at pp. 581-582].)

The high court also stressed that "the Campaign was designed to minimize the disruption to the workplace that had resulted from unlimited ad hoc solicitation activities by *lessening* the amount of expressive activity occurring on federal property." (*Cornelius, supra,* 473 U.S. at p. 805 [87 L.Ed.2d at pp. 581-582].) Indeed, the court pointed out that even those organizations which participated were limited to submitting a 30-word statement for inclusion in the CFC literature. In short, "The Government did not create the CFC for purposes of providing a forum for expressive activity. That such activity occurs in the context of the forum created does not imply that the forum thereby becomes a public forum for First Amendment purposes." (*Ibid.*)

In *U.S. v. Kokinda* (1990) 497 U.S. 720 [111 L.Ed.2d 571, 110 S.Ct. 3115] (hereafter *Kokinda*), a United States Postal Service regulation prohibited "soliciting alms and contributions" on postal premises. Political workers set up a table on the sidewalk near the entrance to a post office and solicited contributions and distributed literature on behalf of the National Democratic Policy Committee. They were convicted of violating the foregoing regulation, but the federal circuit court reversed the judgment on First Amendment grounds. The United States Supreme Court reversed the circuit court, finding no First Amendment violation. A plurality of four justices reasoned that the sidewalk in question was not a traditional public forum because it was wholly on postal service property, led only from the postal patron parking area to the front door of the post office, and was built solely to provide passage for persons engaged in postal business.

Nor was the sidewalk a designated public forum, even though it was conceded that the Postal Service had previously allowed other individuals and groups to leaflet, speak, and picket on postal premises. The plurality reasoned, "The Postal Service has not expressly dedicated its sidewalks to any expressive activity. Indeed, postal property is expressly dedicated to only one means of communication: the posting of public notices on designated bulletin boards. [Citation.] No postal service regulation opens postal sidewalks to any First Amendment activity. To be sure, individuals or groups have been permitted to leaflet, speak, and picket on postal premises [citation], but a regulation prohibiting disruption [citation] and a practice of allowing some speech activities on postal property do not add up to the

dedication of postal property to speech activities." (*Kokinda, supra,* 497 U.S. at p. 730 [ [111 L.Ed.2d at p. 583, 110 S.Ct. at p. 3121].)[11]

Finally, in *ISKCON, supra,* 505 U.S. __ [120 L.Ed.2d 541, 112 S.Ct. 2701], a regulation of the Port Authority of New York and New Jersey prohibited repetitive solicitation of funds in the public terminals of three major airports in the New York metropolitan area. Petitioner, a religious organization, challenged the regulation on First Amendment grounds. Upholding the ban, the United States Supreme Court first ruled that the terminals were not a traditional public forum, "given the lateness with which the modern air terminal has made its appearance" (*id.* at p. __ [120 L.Ed.2d at p. 551, 112 S.Ct. at p. 2706]) and the fact that solicitation in such terminals is an even more recent development.

Nor were the terminals a designated public forum, even though the airport operators had dedicated substantial portions thereof to commercial activities open to the general public, "such as restaurants, snack stands, bars, newsstands, and stores of various types." (*ISKCON, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 548, 112 S.Ct. at p. 2704].) The high court stressed the fact that the airport operators had consistently prohibited solicitation inside the terminals: "Nor can we say that these particular terminals, or airport terminals generally, have been intentionally opened by their operators to such activity; the frequent and continuing litigation evidencing the operators' objections belies any such claim." (*Id.* at p. __ [120 L.Ed.2d at pp. 550-551, 112 S.Ct. at pp. 2706-2707].) And "Even if we look beyond the intent of the Port Authority to the manner in which the terminals have been operated, the terminals have never been dedicated (except under the threat of court order) to expression in the form sought to be exercised here: *i.e.,* the solicitation of contributions and the distribution of literature." (*Id.* at p. __ [120 L.Ed.2d at p. 552, 112 S.Ct. at p. 2707].)

We apply this reasoning to the case at bar. The question is whether the Legislature, by creating the statutory "candidate's statement," intentionally opened a public forum that candidates for local judicial office may use for the purpose of attacking their opponents. Under the foregoing precedents the answer is no. There is no doubt that the Legislature has not explicitly authorized the candidate's statement to be used for such expressive activity. And there is no showing of a legislative policy or practice consistent with an intent to permit such use. On the contrary, section 10012 specifically lists the permissible contents of such a statement as the following: the candidate's

---

[11]Concurring in the judgment, Justice Kennedy found it unnecessary to determine whether the sidewalk in question was a public forum because in his view the regulation was a permissible time, place, and manner restriction.

name, age, occupation, and "a brief description . . . of the candidate's education and qualifications" in no more than 200 words. The negative implication of this specific list, of course, is that the Legislature did not intend the statutory candidate's statement to contain any other material: *expressio unius est exclusio alterius.* (See, e.g., *People* v. *Laiwa* (1983) 34 Cal.3d 711, 723 [195 Cal.Rptr. 503, 669 P.2d 1278], and cases cited.) More important, the Legislature made this implication express in section 10012.1, which explicitly prohibits the use of a statutory candidate's statement by a candidate for local judicial office as a forum for discussing "other candidates for judicial office or . . . another candidate's qualifications, character, or activities." In short, statutory candidates' statements "have never been dedicated . . . to expression in the form sought to be exercised here" (*ISKCON, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 552, 112 S.Ct. at p. 2707]). In the absence of such dedication, the candidate's statement is not a designated public forum within the meaning of current Supreme Court jurisprudence.

In holding to the contrary, the Court of Appeal appears to have relied on the two decisions in which the high court did find a limited public forum by designation: *Widmar* v. *Vincent* (1981) 454 U.S. 263 [70 L.Ed.2d 440, 102 S.Ct. 269] (hereafter *Widmar*), and *Madison Sch. Dist.* v. *Wisconsin Emp. Rel. Comm'n* (1976) 429 U.S. 167 [50 L.Ed.2d 376, 97 S.Ct. 421] (hereafter *Madison School District*). It is true that the first of these cases is often cited for the proposition that a public forum may be created for use by a limited class of speakers, and the second for the proposition that a public forum may be created for the discussion of a limited topic. (See, e.g., *Perry, supra,* 460 U.S. at p. 46, fn. 7 [74 L.Ed.2d at p. 805].) But it does not follow that a public forum is created when, as here, a nontraditional means of communication is limited *both* as to speakers and as to topic. A closer reading of the cases shows why this is so.[12]

In *Widmar, supra,* 454 U.S. 263, a state university adopted a policy of opening its meeting facilities to all its registered students groups. The high court first reasoned that such a university campus was not a traditional public forum: "A university differs in significant respects from public forums such as streets or parks or even municipal theaters." (*Id.* at p. 268, fn. 5 [70 L.Ed.2d at pp. 446-447].)[13] Nor was it an unlimited designated public forum: "We have not held, for example, that a campus must make all of its

---

[12]We do not mean to imply the converse, i.e., that a public forum is necessarily created whenever a nontraditional means of communication is limited either as to speakers or as to topic but not both. The question whether the government has created a designated public forum still turns on the government's intent, and that intent must still be determined on the basis of all the relevant criteria discussed above.

[13]The mention of "municipal theaters" is apparently a reference to *Southeastern Promotions, Ltd.* v. *Conrad* (1975) 420 U.S. 546 [43 L.Ed.2d 448, 95 S.Ct. 1239], in which the high

facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings." (*Widmar, supra*, 454 U.S. at p. 268, fn. 5 [70 L.Ed.2d at pp. 446-447].) Rather, the case presented a public forum created for a limited class of speakers, i.e., registered student groups: "Through its policy of accommodating their meetings, the University has created a forum generally open for use by student groups." (*Id.* at p. 267 [70 L.Ed.2d at pp. 445-446].) But, although it was limited as to speakers, it was not limited as to topics: the forum was "generally open" to such groups, i.e., such groups could discuss any topics of interest to them.[14] Applying the public forum doctrine to these facts, the court held that the First Amendment was violated by a university regulation under which a student group was banned from discussing a particular topic, i.e., religion.

In *Madison School District, supra*, 429 U.S. 167, a statute required school board meetings to be generally open to the public, but the high court recognized that "Plainly, public bodies may confine their meetings to specified subject matter . . . ." (*Id.* at p. 175, fn. 8 [50 L.Ed.2d at pp. 384-385].) The case thus presented a designated public forum unlimited as to speakers but not as to topic: any member of the public could speak, but only on school board business. Applying the public forum doctrine to these facts, the court held that the First Amendment was violated by an administrative ruling that prohibited a particular class of speakers, i.e., teachers who were not union members, from addressing the school board on the relevant topic of collective bargaining negotiations.

Thus in both cases the forum had an unlimited, "public" component: in *Madison School District, supra*, 429 U.S. 167, any member of the public could speak, and in *Widmar, supra*, 454 U.S. 263, any topic could be publicly discussed. Neither is true here: in the statutory candidate's statement the Legislature has created a forum that is limited both as to speakers—nonpartisan candidates for local judicial office—and as to topic—the candidates' own qualifications for the office. There is no unlimited, "public" component, and hence no designated *public* forum. It is true that in their statutory statements the candidates are speaking *to* the public—or at least to the members of the public who are registered voters residing in the county. But a forum is defined by its speakers, not its listeners: for example, in

court held that an administrative denial of permission to show the musical "Hair" in two municipal theaters was an impermissible prior restraint. The decision has been cited as another example of a designated public forum (e.g., *Perry, supra*, 460 U.S. at pp. 45-46 [74 L.Ed.2d at pp. 804-805]), possibly of an "unlimited" character, but the point is far from clear. (See Karst, *Public Enterprise and the Public Forum: A Comment on Southeastern Promotions, Ltd. v. Conrad* (1976) 37 Ohio St. L.J. 247.)

[14]There were over 100 different student groups on the campus.

*Kokinda, supra,* 497 U.S. 720, the excluded political workers were speaking to all members of the public who used the post office, and, in *ISKCON, supra,* 505 U.S. __ [120 L.Ed.2d 541, 112 S.Ct. 2701], the adherents of the excluded religion were speaking to all members of the public who used the terminals of three major airports in the New York metropolitan area. Yet in neither case did the high court find a public forum, either by tradition or by designation. The same is true here.[15]

We reach, accordingly, the last step in applying the public forum doctrine: we test the challenged law by the standard governing the class of forum in issue here—the nonpublic forum. It is settled that in such a forum "the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." (*Perry, supra,* 460 U.S. at p. 46 [74 L.Ed.2d at p. 805].) "Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity." (*Id.* at p. 49 [74 L.Ed.2d at pp. 807-808].) ■ Specifically, "a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum [citation], or if he is not a member of the class of speakers for whose especial benefit the forum was created." (*Cornelius, supra,* 473 U.S. at p. 806 [87 L.Ed.2d at pp. 582-583].) "These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property. The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves." (*Perry, supra,* 460 U.S. at p. 49 [74 L.Ed.2d at p. 807], fn. omitted.)

Again the relevant United States Supreme Court decisions are instructive. In *Perry, supra,* 460 U.S. 37, the high court found it reasonable to exclude the rival teachers' union from the school mail facilities because the union that was allowed access had special responsibilities as the sole bargaining agent. (*Id.* at pp. 51-52 [74 L.Ed.2d at pp. 808-809].) More relevant to the case at bar are two additional grounds cited by the court. First, "exclusion of the rival union may reasonably be considered a means of insuring labor peace within the schools." (*Id.* at p. 52 [74 L.Ed.2d at p. 809].) The court

---

[15]The parties cite decisions in which, in other contexts, other courts have held that the *voter's pamphlet* is a limited public forum. (*Kaplan* v. *County of Los Angeles* (9th Cir. 1990) 894 F.2d 1076, 1080; *Patterson* v. *Board of Supervisors* (1988) 202 Cal.App.3d 22, 29-30 [248 Cal.Rptr. 253]; *Gebert* v. *Patterson* (1986) 186 Cal.App.3d 868, 873-874 [231 Cal.Rptr. 150].) Because of our conclusion in the first step of our analysis that the relevant forum in this case is not the voter's pamphlet as a whole but simply the candidate's statement, these decisions are not in point and we take no position on the question they address.

specifically noted that there need be no proof that such disruption has actually occurred in order "to justify the denial of access to a nonpublic forum on grounds that the proposed use *may* disrupt the property's intended function." (*Id.* at p. 52, fn. 12 [74 L.Ed.2d at p. 809], italics added.)

Second, the court in *Perry* observed that "the reasonableness of the limitations on [the rival union's] access to the school mail system is also supported by the substantial alternative channels that remain open for union-teacher communication to take place. These means range from bulletin boards to meeting facilities to the United States mail. . . . There is no showing here that [the rival union's] ability to communicate with teachers is seriously impinged by the restricted access to the internal mail system. The variety and type of alternative modes of access present here compare favorably with those in other nonpublic forum cases where we have upheld restrictions on access. [Citations.]" (460 U.S. at pp. 53-54 [74 L.Ed.2d at pp. 809-811].)

In *Cornelius, supra,* 473 U.S. 788, the high court found it reasonable on several grounds to exclude legal defense and political advocacy groups from a charity drive among federal employees. Most relevant here are two such grounds. The court again stressed that the exclusion was a reasonable means of avoiding controversy that could be detrimental to the charity drive and disruptive of the federal workplace: "Although the avoidance of controversy is not a valid ground for restricting speech in a public forum, a nonpublic forum by definition is not dedicated to general debate or the free exchange of ideas. The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose." (*Id.* at p. 811 [87 L.Ed.2d at pp. 858-859].)

Again, the court in *Cornelius* emphasized the availability of adequate alternative means of communicating the same message, whether or not those means are equally efficient. As the court explained, there is no "requirement that the restriction be narrowly tailored or that the Government's interest be compelling. The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message. [Citation.] Rarely will a nonpublic forum provide the only means of contact with a particular audience. Here, as in *Perry Education Assn., supra,* [460 U.S.] at [pp.] 53-54 [74 L.Ed.2d at pp. 809-811], the speakers have access to alternative channels, including

direct mail and in-person solicitation outside the workplace, to solicit contributions from federal employees." (*Cornelius, supra,* 473 U.S. at p. 809 [87 L.Ed.2d at pp. 584-585].)[16]

These reasons are equally applicable to the case at bar. Elections for local judicial offices are normally low-profile events. They are frequently uncontested; even if contested, they usually arouse minimal public interest. The voters have little knowledge of the requirements of the job and still less of the qualifications of the candidates; in turn, the candidates frequently have neither the inclination nor the time to inform the voters by means of a traditional political campaign, and in any event may lack the means of doing so—e.g., campaign staff, fundraising committees, media advisers, and so on. To help fill this informational void the Legislature created the statutory candidate's statement. From its terms and conditions we may reasonably infer that its primary purpose is to give the voters at least a minimal amount—200 words' worth—of basic information about the background and qualifications of little-known candidates. In light of that purpose it is plainly reasonable for the Legislature to provide in section 10012.1 that the statement should not also be used by the candidates as a partisan campaign device to attack their opponents. First, to so misuse a statutory statement could well impair its effectiveness in a number of ways. The voters could be distracted or confused by the mixed messages contained in the statement; the statement is necessarily so brief that to the extent a candidate devotes it to attacking others it would convey even less factual information about the candidate's own background and qualifications; and because these statements remain confidential until they are published (see fn. 4, *ante*), all such candidates would have an incentive to misuse them by attacking their opponents in order to avoid the possibility of unanswered attacks by others in the same forum.[17]

Second, section 10012.1 restricts only this one channel of communication with the voters; there remain substantial alternative channels open to

---

[16]Later cases give similar reasons. (See *Kokinda, supra,* 497 U.S. at p. pp. 733-737 [111 L.Ed.2d at pp. 585-588, 110 S.Ct. at pp. 3123-3124] [reasonable to ban soliciting on postal property because soliciting disrupts postal business]; *ISKCON, supra,* 505 U.S. at p. ___ [120 L.Ed.2d at pp. 552-554, 112 S.Ct. at pp. 2708-2709] [reasonable to ban soliciting in airport terminals because soliciting disrupts pedestrian traffic and in any event is freely permitted on sidewalks surrounding terminals].)

[17]Like all statutes, section 10012.1 should be reasonably construed in light of its purpose. For example, if a candidate were to assert in a statutory statement that "I am the best candidate for the office," the implied comparison with other candidates might be deemed to indirectly "refer" to them but could not reasonably be read to attack them. Accordingly, the statute should not be construed to bar such a statement.

candidates for local judicial office that do not bar criticism of opponents—e.g., advertisements or interviews in local newspapers or on local radio and television programs, direct mailings to the community, neighborhood distribution of handbills, and personal appearances at local functions. Although such channels may not be as simple and convenient to use as the candidate's statement, they are not ipso facto constitutionally inadequate; indeed, they may well have much greater impact on the voters. The candidate must in any event use such channels to convey any portion of his or her message that exceeds the prescribed limit on the number of words allowed in the candidate's statement; the same candidate may also use the same channels to convey any portion of his or her message that exceeds the prescribed limit on the content of that statement.[18]

We do not and need not go so far as to hold that attacks on opposing candidates are wholly incompatible with the purposes of the statutory candidate's statement. ▉ "The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation. In contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." (*Cornelius, supra,* 473 U.S. at p. 808 [87 L.Ed.2d at pp. 583-584], italics in original.) ▉ On the two grounds discussed above, the Legislature's decision to limit the statutory candidate's statement to a brief factual statement of the candidate's own background and qualifications is at least reasonable. The governing decisions of the United States Supreme Court ask no more.

It is also clear that the challenged restriction is viewpoint-neutral, i.e., it is "not an effort to suppress expression merely because public officials oppose the speaker's view." (*Perry, supra,* 460 U.S. at p. 46 [74 L.Ed.2d at p. 805].) There is neither claim nor evidence that the Legislature was so motivated when it adopted section 10012.1, and the statute necessarily operates in an evenhanded fashion.

---

[18]Section 10012.1 is thus plainly distinguishable from statutes that bar a specific type of political speech in *all* media, leaving no alternative channels of communication. (See, e.g., *Brown* v. *Hartlage* (1982) 456 U.S. 45 [71 L.Ed.2d 732, 102 S.Ct. 1523] [barring any candidate from promising, if elected, to serve at a salary less than that fixed by law]; *Eu* v. *San Francisco Democratic Comm., supra,* 489 U.S. 214 [barring the governing body of any political party from endorsing or opposing candidates in a primary election]; *Broadrick* v. *Oklahoma* (1973) 413 U.S. 601 [37 L.Ed.2d 830, 93 S.Ct. 2908] [barring state civil service employees from active participation in political campaigns].)

We conclude that section 10012.1 does not violate the free speech guaranty of the First Amendment.[19]

■ Judge Burleigh also contends that section 10012.1 denies him equal protection of the laws under the Fourteenth Amendment because candidates for *nonjudicial* local offices are not subject to its restrictions. In light of our foregoing holding, the claim is without merit. "If a statute regulating the use of public places for speech activities does not conflict with first amendment principles, it almost certainly will be held not to violate equal protection because it does not improperly allocate the ability to engage in a fundamental right." (4 Rotunda & Nowak, Treatise on Constitutional Law (2d ed. 1992) p. 49.)

The point is well illustrated by *Perry, supra,* 460 U.S. 37 at page 54 [74 L.Ed.2d at pages 810-811]: "The Court of Appeals also held that the differential access provided the rival unions constituted impermissible content discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. We have rejected this contention when cast as a First Amendment argument, and it fares no better in equal protection garb. As we have explained above, [the rival union] did not have a First Amendment or other right of access to the interschool mail system. The grant of such access to [the favored union], therefore, does not burden a fundamental right of [the rival union]. Thus, the decision to grant such privileges to [the favored union] need not be tested by the strict scrutiny applied when government action impinges upon a fundamental right protected by the Constitution. [Citation.] The School District's policy need only rationally further a legitimate state purpose. That purpose is clearly found in the special responsibilities of an exclusive bargaining representative."

The high court then distinguished decisions in which it had struck down statutory discriminations between the kinds of picketing permitted on public streets, a traditional public forum. The court explained, "The key to those decisions, however, was the presence of a public forum. In a public forum, by definition, all parties have a constitutional right of access and the State must demonstrate compelling reasons for restricting access to a single class of speakers, a single viewpoint, or a single subject.

"When speakers and subjects are similarly situated, the State may not pick and choose. Conversely on government property that has not been made a public forum, not all speech is equally situated, and the State may draw distinctions which relate to the special purpose for which the property is

---

[19]In view of this holding we find no merit in Judge Burleigh's argument that the statute is an invalid prior restraint on speech.

used. As we have explained above, for a school mail facility, the difference in status between the exclusive bargaining representative and its rival is such a distinction." (*Perry, supra,* 460 U.S. at p. 55 [74 L.Ed.2d at p. 811], fn. omitted; accord, *Minnesota Bd. for Community Colleges* v. *Knight* (1984) 465 U.S. 271, 291-292 [79 L.Ed.2d 299, 316-317, 104 S.Ct. 1058].)

Here, as we have seen, Judge Burleigh did not have a fundamental right to attack Judge Silver in this nonpublic forum. The statute's prohibition against such attacks will therefore be upheld if it is rationally related to a legitimate state purpose. For the reasons explained above, we conclude that the restriction is rationally related to the Legislature's legitimate purpose of assisting the voters by providing them with basic information about the background and qualifications of little-known candidates for local judicial office. Section 10012.1 does not violate the equal protection clause.

The judgment of the Court of Appeal is reversed with directions to affirm the judgment of the trial court.

Lucas, C. J., Panelli, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

Appellant's petition for a rehearing was denied February 18, 1993.

APPENDIX

STATEMENT OF CANDIDATE FOR

JUDGE OF THE SUPERIOR COURT, OFFICE #2

6 YEAR TERM

(NAME) WILLIAM B. BURLEIGH AGE: 55

OCCUPATION: JUDGE OF THE MUNICIPAL COURT

EDUCATION AND QUALIFICATIONS:

After 17 years as Municipal Court Judge, I am challenging the incumbent Superior Court Judge (Jerry Brown appointee).

WHY?

Because, as a citizen, I am greatly disturbed by his decisions.

Criminal activity is being dismissed. Innocent citizens have had their lives and businesses disrupted by court interference.

Some Examples:

A police officer was told the defendant (a convicted murderer on parole) was selling drugs from his camper. When confronted, he attempted to hide the drugs and the officer seized them. Judge Silver dismissed the case. (Reversed on appeal.)

Defendant and victim were fighting. Defendant was losing, left the scene, returned with a knife, stabbed the victim, chased him into the street and killed him. Silver ruled there was no malice.

Marina Safeway, losing $20,000 a month, announced it was closing. Silver ordered Safeway to remain open.

It's time to get tough with criminals . . . time to end court interference in community affairs.

ENDORSED BY POLICE CHIEF'S [sic] ASSOCIATION

Qualifications:

U.S. Marine Corps.
Doctor [of] Jurisprudence, University [of] California, Berkeley.
Nine years private practice; City Attorney.

Vice-President, California Judge's [*sic*] Association.

Faculty, California Judge's [*sic*] College.

Associate Editor, "California Court's [*sic*] Commentary"

Founder, two charity fundraisers (Big Sur Marathon, River Run) raising money for local needy services.