[No. A083687. First Dist., Div. One. Oct. 6, 1999.]

SAN FRANCISCO FORTY-NINERS, Plaintiff and Respondent, v.
NAOMI NISHIOKA, as Acting Director, etc., et al., Defendants and
Respondents;
DOUGLAS COMSTOCK et al., Real Parties in Interest and Appellants.

**COUNSEL**

Nielsen, Merksamer, Parrinello, Mueller & Naylor and James R. Parrinello for Plaintiff and Respondent.

Louise H. Renne, City Attorney, Dennis Aftergut, Chief Assistant City Attorney, Ellen M. Forman and Molly S. Stump, Deputy City Attorneys, for Defendants and Respondents.

Bell, McAndrews & Hiltachk, Charles H. Bell, Jr., Thomas W. Hiltachk and James F. Sweeney for Real Parties in Interest and Appellants.

**OPINION**

**MARCHIANO, J.**—The San Francisco Superior Court issued a writ of mandate prohibiting respondent San Francisco Director of Elections from qualifying an initiative measure for the ballot. The writ issued on the ground that the circulating initiative petition contained false statements intended to mislead voters and induce them to sign the petition. The three proponents of the initiative appeal from the judgment granting the writ. We affirm because an initiative petition which contains objectively inaccurate information and calculated untruths that substantially mislead and misinform a reasonable voter is unlawful under the Elections Code.

## I. FACTS

In a special election in June 1997, the voters of the City and County of San Francisco narrowly approved two initiative measures for the construction of a new football stadium for respondent San Francisco Forty-Niners at Candlestick Point. Proposition D authorized the City to use lease financing

to borrow up to $100 million to finance the stadium. Proposition F amended the City's land use laws to allow construction of the new stadium and an adjacent entertainment and shopping center.

In December 1997, appellant Douglas Comstock, an opponent of the new stadium, filed an election contest alleging that the June 1997 special election should be invalidated due to alleged violations of the election laws. After a fully briefed hearing on April 30, 1998, the superior court sustained demurrers to the election contest without leave to amend and dismissed Comstock's contest.

Shortly before the trial court's ruling, appellant Comstock—joined by appellants Joel Ventresca and Barbara Meskunas—began an initiative drive to repeal Propositions D and F. On April 16, 1998, appellants filed with respondent Director of Elections (Director) a request for the preparation of a ballot title and summary for the proposed initiative. (Elec. Code, § 9105.)[1] Appellants also filed the requisite "notice of intention" to circulate the initiative petition. (§§ 9103, subd. (a), 9104.) On April 29, the San Francisco City Attorney issued the initiative's ballot title and summary, which read as follows:

"REPEAL OF STADIUM BOND AND LAND USE APPROVALS

"Proposition D, adopted by the voters at the June 3, 1997 special election, authorizes the City to use lease financing to borrow up to $100 million to build a stadium at Candlestick Point.

"Proposition F, adopted by the voters at the June 3, 1997 special election, authorizes the City to enter into a lease of park lands at Candlestick Point for non-recreational purposes. Proposition F also changed various City laws relating to zoning and land uses so that a new stadium and an entertainment and shopping center may be built at Candlestick Point.

"This measure is an ordinance that would repeal Proposition D. This measure would also repeal the portions of Proposition F that changed the City's zoning and land use laws."

On April 30, 1998, appellants published the ballot title and summary, plus their notice of intention, in a San Francisco newspaper of general circulation. (§ 9105, subd. (b).) In early May 1998, appellants began to circulate the initiative petition for signatures to qualify the initiative for the November 1998 election. The initiative petition, which is included in the record on

---

[1] Unless otherwise indicated, all statutory citations are to the Elections Code.

appeal, properly contains the ballot title and summary prepared by the city attorney, the text of the notice of intention, the full text of the initiative, an "affidavit of circulator," and an appropriate signature box, in compliance with various provisions of the Elections Code. (§§ 100, 104, 9105, subd. (c), 9108, 9109.)

· The format of the initiative petition is relevant to the issues before us. The petition is a 4-page, 10 inches by 14½ inches flyer. On the inside right-hand page the reader finds the city attorney's ballot title and summary, the text of the notice of intention, and the full text of the initiative. The notice of intention, which "may include a . . . statement, not exceeding 500 words in length, stating the reasons for the proposed petition" (§ 9104), reads as follows:

"Notice is hereby given by the persons whose names appear hereon of their intention to circulate the petition within the City of San Francisco for the purpose of rescinding the vote on Propositions D & F at the special election of June 3, 1997.

"(1) The June 3, 1997 special election on Propositions D and F was fundamentally flawed, and resulted in a denial of the secrecy of the ballot for all San Francisco voters, and was further marred by numerous instances of electioneering and campaigning using municipal funds, and early, secret polling places opened with federal funds in areas thought to favor Yes on D and F.

"(2) The election calls into question the relationship of the non-partisan Department of Elections and the Office of the Mayor and his agents, whose agendas were to pass Propositions D and F regardless of appearance or fairness. This was compounded by questionable financial transactions, including campaign contributions and expenditures to elected and appointed officials with oversight of the election and the related investigation and possible cover-up.

"(3) Legal issues surrounding the 2/3 majority required by Proposition 218 for the passage of bonds remain unresolved.

"(4) The funding of the stadium/shopping mall was not truthfully presented to the voters and taxpayers of the City and County of San Francisco. Real cost estimates far exceed the $100 million, exclusive of interest, which the Mayor and proponents of Propositions D and F insisted would be the 'upper limit.'

"(5) The integrity of San Francisco elections must be paramount. Confidence in the process and its outcome must be restored. Therefore, this

measure would repeal Propositions D and F and require a future election on any proposal to site, re-site, or re-fund, a stadium/mall or any other stadium development in the City and County of San Francisco and would return Candlestick Point Park to its previous and appropriate park land use.

"/s/ Joel Ventresca Barbara Meskunas Doug Comstock"

The front page of the initiative petition is headed "Stop the Mall/Save the Park" in one-inch white type on a magenta background. Beneath that heading, in black half-inch and quarter-inch type, respectively, are subheadings "We can overturn the Stadium Swindle" and "Why San Franciscans Want to Save Candlestick Park." Beneath these headings and subheadings, the five numbered paragraphs of the notice of intention are reprinted verbatim in larger, and more readable, type than that on the inside page of the petition. Beneath the reprinted notice of intention is a half-page of political argument, closing with the exhortation, in black half-inch block capitals, "PLEASE SIGN THE PETITION." The format is such that anyone signing the petition would do so after reading the notice of intention information.

On June 9, 1998, the San Francisco Forty-Niners filed a petition for writ of mandate in the San Francisco Superior Court to stop the circulation of the initiative petition. The mandate petition named as respondents the Director, the City and County of San Francisco (City), and the City's board of supervisors (Board). Appellants were named as real parties in interest.[2] The Forty-Niners alleged that, in violation of numerous provisions of the Elections Code, the initiative petition contained false and misleading statements concerning the reasons for the initiative in order to induce voters to sign the petition. The Forty-Niners specifically pointed to paragraphs (1), (2) and (4) of the notice of intention. The Forty-Niners also alleged that the initiative petition illegally contained campaign propaganda, such as the heading "Stop the Mall/Save the Park."[3] The Forty-Niners sought a writ of mandate to prohibit the Director from qualifying the initiative for the November ballot, and prohibiting the Board from adopting the initiative or placing it before the voters.

The superior court issued an alternative writ and set the matter for hearing. Respondent Director, joined by respondents City and the Board,

---

[2]Despite their designations in the trial court, in this appeal Comstock and his two associates are "appellants," and the Forty-Niners, the Director, the City, and the Board are "respondents."

[3]A declaration filed in support of the mandate petition pointed out that the heading was similar to "Don't Mall the Park"—the slogan of opponents of Propositions A and J on the June 1998 ballot, which involved the expansion of the de Young Museum in Golden Gate Park.

filed an answer to the mandate petition and a return to the alternative writ, in which they also argued that the initiative petition contained false and misleading information. Appellants filed an opposition to the mandate petition claiming there was no authority for a peremptory writ disqualifying an initiative measure for allegedly false and misleading petition statements. Appellants also contended there were in fact no false or misleading statements in the petition, primarily because the notice of intention comprised either "nonjusticiable legislative findings" or matters of opinion not subject to categorization as "true" or "false." Appellants attempted to argue the factual truth of only one paragraph, number (1), dealing with the alleged election flaws, and did not contest the alleged falsity of the other three informational paragraphs in the notice. Finally, and in only a few brief paragraphs, appellants contended that a writ disqualifying their initiative measure would impermissibly infringe upon their right to freedom of political speech.

At the hearing on the petition, the trial court afforded appellants a full evidentiary hearing and found, "This particular initiative has within it statements that are flat-out untrue, and are not denied by those people that have submitted it; or if they do deny them, they certainly didn't bother to do so in the course of this proceeding." The trial court entered a judgment granting the Forty-Niners a peremptory writ of mandate, finding that the initiative petition "contains false and misleading statements of fact" which "have been deliberately made by [appellants] . . . to mislead the electors and to induce electors to sign [the] Initiative Petition."[4] The court concluded the initiative petition was therefore "illegal and void" as in violation of several provisions of the Elections Code, and prohibited the Director from qualifying the initiative measure for the ballot and the Board from adopting the measure or placing it before the voters.

## II. Discussion

■ Appellants contend there was no statutory basis for the trial court's ruling, and that no provision of the Elections Code supports the disqualification of the initiative. We disagree.

■ The ballot box is the sword of democracy. A court will intervene in the initiative process only when there are clear, compelling reasons to do so. We observe at the outset what appellants implicitly recognize: that despite the courts' duty to jealously guard the people's right of initiative and

---

[4]Tracking the court's observation on the record, the judgment included a finding that "[Appellants] failed to introduce evidence contesting the falsity of [the] factual statements in the Initiative Petition and thereby did not deny their falsity."

referendum (see *Rossi* v. *Brown* (1995) 9 Cal.4th 688, 695 [38 Cal.Rptr.2d 363, 889 P.2d 557]), noncompliance with the Elections Code can result in an initiative's disqualification from the ballot. The law is clear that election officials have a ministerial duty to reject initiative petitions which suffer from a substantial, as opposed to a technical, statutory defect which directly affects the quality of information provided to the voters. (*Myers* v. *Patterson* (1987) 196 Cal.App.3d 130, 136-139 [241 Cal.Rptr. 751].) "[W]here petition deficiencies threaten the proper operation of the election process, refusal to file the petition has been judicially upheld. [Citations.]" (*Chase* v. *Brooks* (1986) 187 Cal.App.3d 657, 663 [232 Cal.Rptr. 65].) Although courts are charged to construe the Elections Code to favor the people's awesome initiative power, "the statutes designed to protect the elector from confusing or misleading information should be enforced so as to guarantee the integrity of the process. [Citations.]" (187 Cal.App.3d at p. 663; see *Hebard* v. *Bybee* (1998) 65 Cal.App.4th 1331, 1338 [77 Cal.Rptr.2d 352].)[5]

Our Supreme Court recognized this principle 65 years ago. In *Boyd* v. *Jordan* (1934) 1 Cal.2d 468 [35 P.2d 533], the court issued a writ of mandate to prohibit the Secretary of State from placing an initiative on the ballot because the voters had been insufficiently informed as to its nature and purpose. At that time the Political Code, the statutory predecessor of the Elections Code, required a "short title" on virtually every page of an initiative petition describing the nature of the petition and its subject. (1 Cal.2d at pp. 470-471.) The *Boyd* court found that the short title before it did not adequately explain the initiative: ". . . no information was given [the voter asked to sign the initiative petition] as to the character of the proposed legislation . . . . [The voter] was as much in the dark regarding the real purpose of the proposed measure after reading the short title as he was before he had read it." (*Id.* at p. 472.) The court concluded: "No elector can intelligently exercise his rights under the initiative law without a knowledge of the petition which he is asked to sign, and any legislation which will increase the facilities of the elector to acquire such information is well within the terms of the Constitution permitting the enactment of legislation to facilitate [the initiative process]." (*Id.* at p. 475.)

Numerous decisions have supported the invalidation of initiative measures for Elections Code violations resulting in voter confusion or misinformation. (See, e.g., *Clark* v. *Jordan* (1936) 7 Cal.2d 248 [60 P.2d 457, 106 A.L.R. 549] [misleading short title in violation of Political Code]; *Mervyn's* v. *Reyes*

---

[5]Although initiative and referendum are two distinct procedures, both are governed by the Elections Code and by the principles discussed in the paragraph preceding this footnote. For purposes of style, we use the word "initiative" in this opinion to include both procedures.

(1998) 69 Cal.App.4th 93 [81 Cal.Rptr.2d 148] [failure to include complete text of the initiative measure]; *Hebard* v. *Bybee, supra,* 65 Cal.App.4th 1331 [inaccurate and misleading title of referendum measure]; *Myers* v. *Patterson, supra,* 196 Cal.App.3d 130 [circulating petition without including notice of intention]; *Chase* v. *Brooks, supra,* 187 Cal.App.3d 657 [failure to include complete text of the initiative measure].)

■■■ Appellants contend that no Elections Code provision designed to prevent voter confusion or misinformation has been violated in this case. Appellants are incorrect. Although the parties discuss various sections of the Elections Code, our analysis begins and ends with section 18600.

Section 18600 prohibits the making of intentionally false representations "concerning the contents, purport or effect" of an initiative petition, and specifically with intent to induce a voter into signing the petition.[6] The trial court made a finding of fact that appellants violated section 18600 by making deliberately false statements in order to induce San Francisco voters to sign their initiative petition. We defer to this finding because it is supported by substantial evidence in the record. (*Wilks* v. *Mouton* (1986) 42 Cal.3d 400, 404 [229 Cal.Rptr. 1, 722 P.2d 187].) Appellants did not present evidence before the trial court that the statements in their petition were not false.

We note in passing that, as they did below, appellants do not contest and thereby virtually concede their initiative petition contained false statements. In their opening brief appellants do not specifically challenge the trial court's factual finding of falsity. They attempt to argue the truth of only paragraph (1), i.e., the assertion that the June 1997 special election was invalid. However, in Comstock's appeal from the dismissal of his election contest we have already determined that the June 1997 election results were not flawed by demonstrable election law violations, because any violations

---

[6]Section 18600 provides that "Every person is guilty of a misdemeanor who:

"(a) Circulating, as principal or agent, or having charge or control of the circulation of, or obtaining signatures to, any state or local initiative, referendum or recall petition, intentionally misrepresents or intentionally makes any false statement concerning the contents, purport or effect of the petition to any person who signs, or who desires to sign, or who is requested to sign, or who makes inquiries with reference to it, or to whom it is presented for his or her signature.

"(b) Willfully and knowingly circulates, publishes, or exhibits any false statement or misrepresentation concerning the contents, purport or effect of any state or local initiative, referendum, or recall petition for the purpose of obtaining any signature to, or persuading or influencing any person to sign, that petition."

Subdivision (c) of the statute is not relevant to our discussion.

alleged in Comstock's election contest did not affect the result of the election and the right to a secret ballot was not denied to all voters. (*Comstock* v. *Nishioka* (Dec. 23, 1998) A084487 [nonpub. opn.].)[7]

Appellants contend that section 18600 does not apply here because any false statements in their initiative petition were not "concerning the contents, purport or effect" of the initiative. Appellants distinguish between the *nature* or *effect* of the petition and the *reasons* why it should be supported by the voters, and suggest that section 18600 bans false statements misrepresenting the nature or effect of an initiative, but not false factual assertions as to the reasons why a voter should sign the petition.

We decline to interpret section 18600 as appellants wish.[8] Appellants circulated an initiative petition essentially to reverse a democratic election and repeal Propositions D and F. To convince voters there was a need to repeal these measures and thus induce them to sign their petition, appellants falsely represented the purported invalidity of the propositions and their enactment, as well as their purported adverse impact on the City. While appellants did not misrepresent the *contents* or *effect* of the initiative measure—that it would in fact repeal Propositions D and F—appellants made false statements concerning the *purport* of the initiative. ▮ "Purport" is broader than "contents" and "effect" and includes such notions as "tenor," "import," "gist," "substance," and "purpose." (Webster's New Internat. Dict. (3d ed. 1961) p. 1847.) ▮ The Legislature, presumably aware of *Boyd*'s injunction against misleading a voter "regarding the real purpose of [a] proposed [initiative] measure" (*Boyd* v. *Jordan, supra,* 1 Cal.2d at p. 472), included the broader term "purport" in section 18600 when it was enacted in 1994.

Appellants misled voters as to the tenor, substance and purpose of their initiative by claiming it was justified by facts which were materially false. In essence the petition stated that the voters should repeal Propositions D and F because the previous election was fraudulent, the funding of the stadium would cost San Franciscans more than the represented limit of $100 million, and the two-thirds majority required by Proposition 218 placed the results in

---

[7]Under the circumstances of this case we may cite our prior unpublished opinion. (Cal. Rules of Court, rule 977(b)(1).)

[8]Two reported cases interpreting statutory predecessors of section 18600 involve only false signatures on initiative petitions or false affidavits in support thereof. (See *People* v. *Calban* (1976) 65 Cal.App.3d 578 [135 Cal.Rptr. 441]; *People* v. *Carroll* (1919) 39 Cal.App. 654 [180 P. 49].)

question. These misleading falsehoods violated the rationale of section 18600 and justified the trial court's issuance of a writ.[9]

Appellants also contend the writ of mandate constitutes an unlawful prior restraint of their right of free speech under the First Amendment of the United States Constitution. Although initiative petition circulation, for example, is core political speech for which First Amendment protection is at its zenith, political speech in the election arena is still subject to regulation to promote fair and honest elections. (See *Buckley* v. *American Constitutional Law Foundation, Inc.* (1999) 525 U.S. 182 [119 S.Ct. 636, 142 L.Ed.2d 599].)[10]

California cases have not considered whether there is a First Amendment right to include false and misleading information in an initiative petition. However, a review of other election law cases demonstrates that while the right of free speech is one of the most precious rights to citizens of a free and open society, it is not without limit when the state Constitution provides it with a special forum for an initiative process in which voters are asked to sign a petition which ultimately may impact the community.

Appellants cite several well-known, but largely irrelevant cases from the pantheon of First Amendment jurisprudence. We look instead to *Clark* v. *Burleigh* (1992) 4 Cal.4th 474 [14 Cal.Rptr.2d 455, 841 P.2d 975], in which our Supreme Court, applying the analysis of *Cornelius* v. *NAACP Legal Defense & Ed. Fund* (1985) 473 U.S. 788 [105 S.Ct. 3439, 87 L.Ed.2d 567], held that a judicial candidate's statement contained in a ballot pamphlet was not a traditional public forum for First Amendment purposes, but a "nonpublic forum" in which expressive activity can be subject to reasonable regulation. (4 Cal.4th at pp. 482-489, 491.) The statement, which was strictly limited in its content by the Elections Code (4 Cal.4th at p. 479), was found to be a nonpublic forum because the Legislature did not create a judicial candidate statement as an open forum for unfettered expressive activity in general. (*Id.* at pp. 485-489; see 473 U.S. at p. 805 [105 S.Ct. at pp. 3450-3451].)

In *Patterson* v. *Board of Supervisors* (1988) 202 Cal.App.3d 22 [248 Cal.Rptr. 253], this court applied the *Cornelius* analysis to a constitutional

---

[9]In light of this conclusion, we need not reach the Forty-Niners' contention that the initiative petition violated other provisions of the Elections Code, and we necessarily reject appellants' contention that the trial court's judgment was an improper interference with the people's power of initiative.

[10]*Buckley* invalidated several Colorado statutes regulating registration, badge, and disclosure requirements for initiative circulators but emphasized that the state retained rights to prevent fraud.

challenge to former sections 3795 and 5025, which empowered a trial court to enjoin publication in a voter's pamphlet of ballot arguments which were false and misleading. We concluded that a voter's pamphlet is not a traditional public forum: "Political speech is, of course, protected under both the federal and state Constitutions. However, it is not the traditional political speech of campaign literature, public speeches or demonstrations, or even public solicitation, that is at issue herein. Rather, the challenge focuses on a specific instrument funded by the [government] in order to convey information to the voters about an upcoming election. . . ." (202 Cal.App.3d at p. 29.) "The speech activities permitted in the voter's pamphlet—unlike those in traditional public fora such as streets and parks—are narrowly circumscribed to the ballot measures proposed for public consideration." (*Gebert* v. *Patterson* (1986) 186 Cal.App.3d 868, 874 [231 Cal.Rptr. 150].)

In *Patterson* we upheld the challenged statutes because of the government's compelling interest in preserving "the integrity of the election process" and the ability of the voter to "mak[e] informed voting choices." (*Patterson* v. *Board of Supervisors, supra,* 202 Cal.App.3d at p. 30.) We also observed that a prohibition on false and misleading information was "content-neutral" and did not "limit nor curtail the ability of individuals or groups to assemble, to speak, to distribute literature or to lobby public opinion in whatever form and content they choose. [Citation.]" (*Id.* at p. 31.)

*Clark* and *Patterson* compel the conclusion that appellants did not enjoy a First Amendment right to include false and misleading information in their initiative petition. ■ An initiative petition fits the definition of expressive activity in a nonpublic forum, not the traditional public forum of unregulated political speech. The initiative petition with its notice of intention is not a handbill or campaign flyer—it is an official election document subject to various restrictions by the Elections Code, including reasonable content requirements of truth. It is the constitutionally and legislatively sanctioned method by which an election is obtained on a given initiative proposal. The state clearly has a legitimate, compelling regulatory interest in preserving the integrity of the initiative process from intentional falsehoods designed to mislead voters into qualifying a measure for the ballot. Moreover, when presented with a petition by a circulator, voters have a right to rely on the integrity of the initiative process and the accuracy of the petition which they properly believe complies with Elections Code requirements.

The initiative process itself is a winnowing process which usually does not involve court intervention. This is particularly true at the commencement of the process with the gathering of sufficient signatures to permit ballot consideration. Even with paid signature gatherers, many embryonic initiatives never grow beyond that stage because a sufficient number of voters are not persuaded to write approving signatures in support of the proposal.

Even after a petition qualifies for the ballot, opponents have an opportunity to dissuade the electorate in the media, with debates, advertisements, circulars and ultimately with opposing statements in the ballot pamphlet. The ballot pamphlet itself is subject to restrained scrutiny under section 9092.[11] The arena of the entire initiative process, through the final tabulation of yes or no, is the appropriate ring in which voters rightfully determine the winner. Opponents should not look to the court to stop the bell before round one. Partisan, persuasive argument in a petition is the norm. When confronted with assertions of fact which are subject to dispute, even if the proponents choose not to controvert the opposition at a mandamus hearing, the court ordinarily cannot substitute its judgment or opinion for the judgment of the electorate to listen and decide. Inherent in a democracy with a constitutional initiative right is the right of the *demos,* the people, to choose between competing positions affecting their community.

Nevertheless, the people also have a right to rely on the integrity of the initiative process from beginning to end. Because the initiative process bypasses the normal legislative process, safeguards are necessary to prevent abuses and provide for an informed electorate. Ordinary citizens with a sense of trust should be able to believe in the accuracy of what they are signing. Although the truthfulness of ideas may not always be recognizable, verifiable factual untruths are. When presented in that rare instance with facts which are conclusively and objectively untrue and mislead potential signers, the court fulfills its mandated duty under the Elections Code of safeguarding the integrity of the initiative process by its action. When, as in this case, the record demonstrates that uncontested, objectively verifiable evidence of untruth is presented to the court, and the opposition consists of halfhearted sounds of silence without evidentiary support, the court is left with no alternative except to find that misleading untruths masquerading as facts are present. The court's action enhances the initiative process and promotes the confidence of the voters by preventing fraud on the electorate.

██ We note we are speaking of outright falsehoods in an official election document and not the typical hyperbole and opinionated comments common to political debate. Appellants are not under a chilling effect which prevents them from speaking out against the Forty-Niners' stadium proposal.

[11]Section 9092 provides, in pertinent part: "Not less than 20 days before he or she submits the copy for the ballot pamphlet to the State Printer, the Secretary of State shall make the copy available for public examination. Any elector may seek a writ of mandate requiring any copy to be amended or deleted from the ballot pamphlet. A peremptory writ of mandate shall issue only upon clear and convincing proof that the copy in question is false, misleading, or inconsistent with the requirements of this code or Chapter 8 (commencing with Section 88000) of Title 9 of the Government Code, and that issuance of the writ will not substantially interfere with the printing and distribution of the ballot pamphlet as required by law. . . ."

Appellants are free to speak out in any of the varied available traditional public forums. They are also free to circulate an initiative petition with persuasive language devoid of false and misleading statements. They have a right to try to repeal Propositions D and F. We recognize that courts should rarely interfere with the political process, especially the initiative process where competing ideas converge. All we do in this case is uphold a writ of mandate issued against a particular petition which clearly violated the Elections Code because it contains undisputed, objective untruths calculated to mislead and misinform a reasonable voter.

Based on the uncontroverted record in this case, we hold that in the narrow and hopefully rare instance where an initiative petition contains misleading assertions of fact that are false beyond dispute, a writ may issue to prevent the circulation of the undisputed falsehoods. Examples include telling a prospective signer that the previous election resulted in a denial of the secrecy ballot for all San Francisco voters when it did not; that the real cost estimates far exceed the upper limit of $100 million, when that was the absolute ceiling under Proposition D; and that legal issues surrounding the two-thirds majority required by Proposition 218 remain unresolved, when that proposition was not applicable. This rule does not apply to expressions of opinion nor to factual matters which are subject to question or dispute. The limited power of the court to act rests on the premise that while errors of opinion must be exposed by the clash of public debate, the contest should not be distorted by deliberate and demonstrable acts of fraud.

### III. DISPOSITION

The judgment granting the peremptory writ of mandate is affirmed.

Strankman, P. J., and Swager, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied January 13, 2000.