[No. B157433. Second Dist., Div. Eight. Sept. 19, 2002.]

JOSEPH RUIZ, Plaintiff and Respondent, v.
JULIA SYLVA, Defendant and Appellant;
RAUL MORIEL et al., Real Parties in Interest.

[No. B157803. Second Dist., Div. Eight. Sept. 19, 2002.]

ALBERT ROBLES et al., Plaintiffs and Appellants, v.
CARMEN AVALOS, Defendant and Respondent;
JOSEPH RUIZ et al., Real Parties in Interest.

**COUNSEL**

Edward J. Horowitz for Plaintiffs and Appellants.

Horvitz & Levy, Mitchell C. Tilner; Albright, Yee & Schmit, Clifton W. Albright and Timothy J. Hall for Defendant and Appellant Julia Sylva.

Smith Kaufman, Stephen J. Kaufman; Law Offices of Nate G. Kraut and Nate G. Kraut for Plaintiff and Respondent.

Bill Jones, Secretary of State, William P. Wood; Bill Lockyer, Attorney General, Andrea Lynch Hoch, Assistant Attorney General, Louis R. Mauro and Susan R. Oie, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiff and Respondent.

Beltran & Medina, J. Arnoldo Beltran, Donald P. Johnson and Douglas G. Chapman III for Defendant and Respondent.

Smith Kaufman, Stephen J. Kaufman; and Nate G. Kraut for Real Parties in Interest.

Bill Lockyer, Attorney General, Andrea Lynch Hoch, Assistant Attorney General, Louis R. Mauro and Susan R. Oie, Deputy Attorneys General, as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

**COOPER, P. J.**—Elections Code[1] section 11041, subdivision (b) requires that "[a]ll petition sections shall be printed in uniform size and darkness with uniform spacing." We hold that this statute requires the use of a uniform typeface in the statement of reasons for the recall and the answer of the recall target. The petitions submitted to the South Gate elections official to recall Raul Moriel, Xochilt Ruvalcaba, Maria Benavides, and Albert Robles (Petitions) do not actually comply with section 11041, subdivision (b). The statement of reasons for the recall and the answers of the recall targets were not printed in uniform typefaces. However, even though the Petitions do not actually comply with section 11041, subdivision (b), they are valid under the doctrine of substantial compliance. The purpose of section 11041, subdivision (b)—to ensure equal emphasis of the statement of reasons and the answer—was satisfied because neither the statement nor the answers were unduly emphasized.

The trial court also concluded that the Petitions were valid. We affirm the trial court's grant of a petition for writ of mandate sought by proponents of the recall of Robles, Benavides, Ruvalcaba, and Moriel (Proponents). We also affirm the trial court's denial of Robles, Benavides, Ruvalcaba, and Moriel's petition for writ of mandate.

### FACTUAL BACKGROUND

Joseph Ruiz and other South Gate residents initiated the process to recall Moriel, Ruvalcaba, Benavides and Robles (Target Officials). The process requires, inter alia, submitting two blank copies of the petition for recall with the elections official. (§ 11042, subd. (a).) The petition must include a notice of intention, which includes a statement of the reasons for the proposed recall. (§ 11020, subd. (b) (sometimes referred to as the statement).) If the target of the recall files an answer "to the statement of the proponents," the answer must be included in the petition. (§§ 11023, subd. (a), 11041, subd. (a)(3).)

After receiving the two blank copies, the elections official has 10 days to notify the proponents, in writing, whether the form and wording of the petition conforms to the Elections Code. (§ 11042, subds. (a) & (b).) Once the elections official approves the form and wording of the petition, the recall proponents may circulate the petition for signature. (§ 11042, subd. (d).)

On October 22, 2001, the Proponents filed separate petitions to recall Moriel, Ruvalcaba and Benavides. On October 31, 2001, Carmen Avalos,

---

[1] All further undesignated statutory citations are to this code.

the South Gate elections official, wrote Ruiz, informing him the Petitions did not comply with the Elections Code and were null and void. Avalos enumerated the defects: (1) "[i]n the city of South Gate the number of valid signatures [to satisfy Elections Code section 11020] needs to be twenty. . ."; (2) three listed Proponents' addresses "did not match with what the records of the registrar recorder had on file"; and (3) "it was difficult to verify three of the proponents on the form due to illegible signatures that were difficult to confirm."

The Proponents revised the three Petitions and drafted a fourth for the recall of Robles. They filed the Petitions on November 6, 2001. Each notice of intention included the name and title of the officer sought to be recalled (§ 11020) and a statement of the reasons for the proposed recall (§ 11020). Each petition also contained a proof of service demonstrating that each recall target was personally served with a copy of the notice of intention relating to that target.

On November 12, 2001, Moriel and Benavides filed an answer and the next day, Ruvalcaba and Robles filed an answer (§ 11023). Benavides's answer, which is similar to the other three answers, provides in English and Spanish as follows: **Do Not Sign** this Legal Document without consulting with your Attorney. The law requires the person who gives you this form to be a United States Citizen and registered voter in the City of South Gate. Ask for California Driver's license, if this person refuses to identify themselves or you know that they are circulating this petition illegally, call the City Attorney 323-563-9538 or the Reward Hot Line 323-567-1368. A **$1,000.00 reward** is available for information leading to conviction of persons circulating this petition who are not United States Citizens and registered voters of South Gate. You may remain anonymous."

Including both the English and Spanish versions, a total of eight words were underlined and 10 were printed in bold type. The remainder of the answer was printed in plain type. Moriel's answer differed from Benavides's answer in that the phrase "Ask for California Driver's License" was underlined.[2]

On November 16, 2001, Avalos wrote Araceli Dominiguez, another South Gate resident and recall proponent, in connection with the recall effort. The letter, in pertinent part, stated as follows: "Pursuant to Elections Code 11022, the proof of publication of notice of intention to recall has been met. However in order to proceed with the recall process of the above mentioned

---

[2]As indicated, the word "License" was capitalized in Moriel's answer. The answers include other minor variations, which are neither substantial nor relevant to these appeals.

officers [Ruvalcaba, Moriel, Benavides, and Robles] you must also comply with Elections Code 11041 as to the form of recall petition and Elections Code 11042 filing copies of proposed petition."

On November 21, 2001, Avalos wrote Ruiz three separate letters approving the Petitions for recall of Moriel, Benavides, and Robles. Each letter provided as follows: "We find the proposed form to be in compliance with all of the pertinent requirements of the Elections Code and hereby find that the petition may be circulated and signatures gathered from the registered voters in the City of South Gate."

Avalos, however, rejected the petition to recall Ruvalcaba, stating "I must reject your petition due to the missing words in your submitted petition. It is not uniform with what was indicated in the filed Notice of Intention or the proof of publication submitted to our office." The Proponents then submitted a revised petition to recall Ruvalcaba. The revised petition was rejected because "[t]here are smudges of ink on one of the petitions." On November 27, 2001, in a letter to Antonio Mendez, a resident of South Gate, Avalos approved a petition to recall Ruvalcaba, indicating the petition was in compliance with the Elections Code requirements.

On December 10, 2001, Avalos wrote Ruiz that the Petitions were "flawed." According to Avalos's letter, "[t]he error consists of a failure to comply with California Elections Code Section 11040(a), which requires that 'the Petition may consist of any number of separate sections, which shall be duplicates except as to signatures and matters required to be affixed by signers and circulators.' This means that all pages that require the signatures of the voters 'shall be duplicates.' " Avalos further informed Ruiz that the recall effort must be started anew. The Proponents of the recall continued to gather signatures despite Avalos's letter withdrawing approval.

PROCEDURAL BACKGROUND

On January 22, 2002, the Proponents filed a verified petition for writ of mandate requesting that the trial court declare Avalos's December 10, 2001 letter invalid and requiring the South Gate City Clerk to accept the Petitions if filed by the statutory deadline. Avalos, Julia Sylva, the elections official who replaced Avalos, and Salvador Alva, the South Gate City Attorney, were named as respondents, and the Target Officials were named as the real parties in interest. The Target Officials filed a separate petition for writ of mandate.

During a hearing on both Ruiz's and the Target Officials' Petitions for writ of mandate, the trial court indicated that the use of bold and underlining

in the Target Officials' answers "balances out" the use of bold in the Proponents' statements. The trial court further found that "[t]he answer has underlining and bold print just like the statement does. In fact, the bold print and the underlining is really more striking when it's in specific words and specific thoughts or ideas or terms than when it is in the whole section. . . . I don't think the size of the letters is really different."

The trial court also concluded that Avalos's December 10, 2001 "letter rescinding the approval by the city clerk for noncompliance with 11040 was void, and there is no evidence that the petitions did not comply with that section, that's 11040, therefore there was nothing at that point improper about the proponents continuing to collect signatures . . . ."

On March 20, 2002, the trial court granted Ruiz's petition for writ of mandate and directed "Respondent Julia Sylva to vacate the December 10, 2001 rescission of Respondent Carmen Avalos' approval of the petitions to recall City of South Gate Mayor Raul Moriel, Vice-Mayor Xochilt Ruval-caba, Council Member Maria Benavides, and City Treasurer Albert Robles, and to notify Petitioner, in writing, that the December 10, 2001 letter was of no force and effect . . . ."

The trial court also ordered that "Julia Sylva, Elections Official for the City of South Gate, shall receive for filing at the Los Angeles County Registrar-Recorder's office all petitions to recall Real Parties in Interest submitted by Petitioner and the recall proponents by the statutory deadlines. Said petitions shall remain in the custody of the Los Angeles County Registrar-Recorder's office while they are being processed by Respondent Sylva or her designee in accordance with applicable Elections Code provisions." Sylva appealed the same day from the grant of Ruiz's petition for mandate and the proceedings were automatically stayed.[3] (Code Civ. Proc., § 916.)

The petition for writ of mandate filed by the Target Officials was denied.

On March 21, 2002, the trial court ordered the Los Angeles County Registrar-Recorder to receive the Petitions for filing. The court ordered, in the alternative, the submission of the petitions to Sylva if Sylva is present at the office of the registrar-recorder. If Sylva is not present at the registrar-recorder's office, the Petitions should be maintained in a secure location.

---

[3]We take judicial notice that the Legislature passed and, on August 24, 2002, the Governor approved, Senate Bill No. 803 (2001-2002 Reg. Sess.). Section 2 of that legislation provides "[a]ny recall or special election in the City of South Gate held during the 2002 and 2003 calendar years shall be administered, for all purposes, by the Los Angeles County Registrar-Recorder upon approval by the Los Angeles County Board of Supervisors." (Evid. Code § 451, subd. (a).)

The trial court also ordered that the Petitions are to be deemed to be timely filed if this court affirms the judgment.

On April 4, 2002, Robles, Moriel, Ruvalcaba and Benavides appealed from the denial of their petition for writ of mandate and joined in most of Sylva's brief.

We denied Ruiz's request to lift the automatic stay and consolidated the appeals from the grant of Ruiz's petition for writ of mandate and from the denial of the Target Officials' petition for writ of mandate. We also granted the Secretary of State, the official responsible for the administration of the provisions of the Elections Code (Gov. Code, § 12172.5), permission to file amicus curiae briefs in both cases.

DISCUSSION

In part I, we begin with the principal issue—whether section 11041, subdivision (b) requires that the statement and answer contain a uniform typeface, a circumstance indisputably absent from this case. We answer that question affirmatively. Therefore, in part II, we focus on the issue of substantial compliance. Finally, we discuss Sylva's contention that the signatures collected after Avalos's purported rescission letter are invalid. To resolve this appeal we need not and do not consider the parties' remaining contentions.[4]

I. *The Petitions Do Not Actually Comply with Section 11041, Subdivision (b)*

The principal issue in these appeals involves the statutory construction of section 11041, subdivision (b). The statute provides: "All petition sections shall be printed in uniform size and darkness with uniform spacing." We must determine what the Legislature intended when it enacted the law.

The parties and amici curiae provide three different interpretations of the legislative intent. Ruiz argues the statute requires "that a copy of the petition signed by one voter must look the same as another copy signed by another voter—thereby ensuring that all voters are presented with the same information, in the same form." This argument, which the trial court adopted, is rooted in the plain language of the statute. Section means copy of the

---

[4]The Target Officials' claim that the deliberate choices of the Proponents create an independent basis to reject the recall petition is meritless. None of the cases cited by the Target Officials create an independent basis for rejecting a petition for recall based on the deliberate action of the recall election proponents. If the Petitions complied or substantially complied with the Elections Code they must be accepted.

petition. (*Hebard v. Bybee* (1998) 65 Cal.App.4th 1331, 1335 [77 Cal.Rptr.2d 352] [defining section as copy]; *Myers v. Patterson* (1987) 196 Cal.App.3d 130 [241 Cal.Rptr. 751] [using the term section to mean copy].) Thus, according to the plain language of the statute, all "copies" must have "uniform size and darkness."

While the strength of Ruiz's interpretation is that it defines "section" as the term is commonly used in the Elections Code, the weakness is that the statutory language, as he interprets it, is duplicative. Section 11040, subdivision (a) states that "[t]he petition may consist of any number of separate sections, which shall be duplicates except as to signatures and matters required to be affixed by signers and circulators." Thus, under section 11040, subdivision (a) each copy of the petition must be a duplicate of all other copies. A duplicate is "exactly the same as one or more others of its kind" and would, therefore necessarily have identical size, darkness, and spacing. (Webster's 3d New Internat. Dict. (1993) p. 702 [defining duplicate as "consisting of or existing in two corresponding or identical parts or examples; being exactly the same as one or more others of its kind . . . ."].) The meaning Ruiz ascribes to section 11041, subdivision (b) is no different from the meaning of section 11040, subdivision (a).

In contrast to Ruiz, Sylva argues that "the typeface on any and every section of the petition that is circulated for signatures must be uniform in size, darkness, and spacing." She further contends that the "plain meaning of section 11041, subdivision (b), is that, on a recall petition, the recall proponents' statement of reasons for recall and the target official's answer must be printed in the same typeface." Although Sylva expressly states that a section, as used in the statute, is a copy of the petition, her interpretation requires defining section as paragraph. If the term "section" means paragraph, then all petition paragraphs shall be printed in uniform size and darkness. But, if the term "section" means copy, as Sylva claims, only the copies must be uniform, not each paragraph of the petition.

The Target Officials concur in Sylva's interpretation of the statute, stating "the recall proponent's statement of reasons for recall and the target official's answer must be printed in the same typeface." Like Sylva, the Target Officials explicitly define section as copy, but implicitly reject a literal construction of the statute because they eschew the claim that only copies of the Petitions must be uniform.

The Secretary of State rejects both parties' interpretations and argues that "the Notice of intention and the Answer [must] be printed in the same type size. However, this does not preclude the parties from utilizing bolding,

underlining, italics or different fonts, even though these variations can result in distinctly different measurements." The Secretary of State interprets section 11041, subdivision (b) to mean "that the elections official must reject a petition prepared by the proponents of a recall election that differs *in any way* from the original Notice of Intention [including the statement] or the Answer." (Italics in original, fn. omitted.) The Secretary of State carves out a limited exception. In a "rare[]" circumstance, he has advised that the recall election proponents may print the answer in a manner that differs from the way it was prepared: "Occasionally an elections official will be presented with an answer that has been prepared in a bizarre shape (e.g., a Christmas tree) or paragraph construction . . . ."

The Secretary of State's analysis is not based on the statutory language and even conflicts with the language of the statute. Whereas the statute requires uniform size, darkness, and spacing, the Secretary permits "variations [that] can result in distinctly different measurements." The Secretary describes his approach as one "providing a consistent and workable interpretation of the law relating to recall elections." The legislative history, however, reveals a conflict between his interpretation and that of March Fong Eu, the Secretary of State at the time the legislation was enacted.[5]

The legislative analysis completed when section 11041, subdivision (b) was being considered provided: "Current law does not prohibit proponents from printing the notice of intention in a larger and bolder type than that used for the officer's answer. Requiring all petition sections to be printed in a uniform size and darkness would ensure that both the notice of intention (which includes the recall statement) and the official's answer are given equal emphasis on the petition."[6] █ While the current Secretary of State argues his interpretation is entitled to great weight because he is responsible for enforcing the legislation, the authority he cites stands for the proposition that a *contemporaneous* administrative construction of the statute by the administrative agency charged with its enforcement and interpretation is entitled to great weight. (*Wilkinson v. Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 491, 501 [138 Cal.Rptr. 696, 564 P.2d 848]; *Andal v. Miller* (1994) 28 Cal.App.4th 358, 365, fn. 3 [34 Cal.Rptr.2d 88].) █ Thus, under *Wilkinson* and *Andal,* the prior interpretation of Secretary Eu is the one

---

[5]Ruiz correctly points out that the memorandum issued by former Secretary of State March Fong Eu's office was not officially signed by her and argues it is unreliable. Because the memorandum was printed on her letterhead and identified a contact person on her staff, we are not persuaded the lack of Secretary Eu's personal signature renders the memorandum unreliable.

[6]Sylva's request to take judicial notice of the legislative history of section 11041, subdivision (b) is granted. (Evid. Code § 452.)

entitled to great weight because she interpreted the statute at the time the statute legislation was under consideration.[7]

■ In construing section 11041, subdivision (b), we must ascertain the Legislature's intent to effectuate the legislative purpose. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386 [241 Cal.Rptr. 67, 743 P.2d 1323].) "The statute's plain meaning controls the court's interpretation unless its words are ambiguous. If the plain language of a statute is unambiguous, no court need, or should, go beyond that pure expression of legislative intent." (*Kobzoff v. Los Angeles County Harbor/ UCLA Medical Center* (1998) 19 Cal.4th 851, 861 [80 Cal.Rptr.2d 803, 968 P.2d 514].) In contrast, where the statutory language is ambiguous other indicia of legislative intent must be considered. (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519 [106 Cal.Rptr.2d 548, 22 P.3d 324] [when a statute "is susceptible to more than one reasonable interpretation, then we look to 'extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part' "].) A statute should not be construed in a manner that renders it superfluous. (*Dix v. Superior Court* (1991) 53 Cal.3d 442, 459, 279 [279 Cal.Rptr. 834, 807 P.2d 1063]; *Young v. Gannon* (2002) 97 Cal.App.4th 209, 223 [118 Cal.Rptr.2d 187].) "Literal construction of statutory language will not prevail if contrary to the legislative intent apparent in the statutory scheme." (*Gomes v. County of Mendocino* (1995) 37 Cal.App.4th 977, 986 [44 Cal.Rptr.2d 93].)

■ The construction proposed by the Proponents, a literal construction, renders section 11041, subdivision (b) superfluous. Because statutes should not be construed in a manner that renders them meaningless (*Dix v. Superior Court, supra*, 53 Cal.3d at p. 459), we look beyond the plain language to ascertain the legislative intent. Accordingly, we review the legislative history of section 11041, subdivision (b). The statute was proposed at the request of the Los Angeles County Registrar-Recorder and introduced by

---

[7]William Wood, chief counsel for the current Secretary of State, communicated directly with Ruiz's counsel regarding the meaning of the term "section" and provided an opinion concerning whether uniform typeface was required in the statement and the answer. According to Wood, "A section is the piece of paper which is circulated and upon which signatures are attached." The letter continued, "Each section may have multiple pages . . . ." Wood also stated, "Each page may have multiple font sizes or boldfacing. The Elections Code sets minimum font sizes for some parts of the petition, but otherwise recall proponents are given some latitude in font size and boldfacing. Even though each page may have multiple font sizes and/or boldfacing, each section which contains that page or pages must be the same." Wood's analysis cites no authority for its conclusion and it is not binding on this court. (Cf. *Wilkinson v. Workers' Comp. Appeals Bd., supra*, 19 Cal.3d at p. 501 [contemporaneous administrative construction not entitled to great weight where clearly erroneous].)

Assemblymember David Elder in 1983. According to a memorandum of support from the office of Secretary Eu, the new legislation was necessary because "There is no provision that prohibits proponents from printing a recall petition in different type sizes. For example, the notice of intention (including grounds for recall) in ten-point type size and the officer's answer in a small six-point type size." The same memorandum explained that the bill would "impose a requirement for uniformity throughout the petition." Significantly, Assemblymember Elder's analysis, contained in a letter to the Governor requesting his approval of the bill, also indicated that the amendment would require "recall petitions to be printed in uniform type and size." (See *People v. Pena* (1999) 74 Cal.App.4th 1078, 1083 [88 Cal.Rptr.2d 656] [considering letter from author to governor urging passage of legislation when ascertaining legislative intent].)

Based on the legislative history stressing the need for equal emphasis, we conclude that section 11041, subdivision (b) requires that the statement and answer be printed in uniform size and darkness. This interpretation, advanced by Sylva and the Target Officials, is most consistent with the legislative intent. (*People v. Thomas* (1992) 4 Cal.4th 206, 210 [14 Cal.Rptr.2d 174, 841 P.2d 159] [" 'The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law' "].)

While one canon of statutory construction calls for liberal construction of recall statutes in favor of the right to recall elected officials (*Gage v. Jordan* (1944) 23 Cal.2d 794, 799 [147 P.2d 387]), a court cannot "enlarge the scope of a procedural statute where the statutory provisions are clear." (*Wilcox v. Enstad* (1981) 122 Cal.App.3d 641, 651 [176 Cal.Rptr. 560].) The legislative intent, as reflected in the legislative history indicates that section 11041, subdivision (b) requires that the statement and answer be printed in uniform size and darkness with uniform spacing. This construction is the only one confirmed by the legislative purpose.

The practical consequence of this holding is that the Proponents, who control the recall process, will select the typeface for both the statement and the answer. The Proponents, however, will not derive any special benefit from their ability to select the typeface precisely because of the uniformity requirement. If granting the recall Proponents an opportunity to select the typeface is deemed to be undesirable, the Legislature may amend the statute to specify a particular typeface as it has done in other situations. (See, e.g., §§ 9008, 9160.)

Ruiz and the Secretary of State surmise that other deleterious consequences will flow from this holding. The Secretary of State argues the

"target officials could, in every instance, thwart the entire recall process simply by choosing a type size and darkness different from that selected by the proponents." If the Target Officials choose a typeface different from that employed by the proponents, the Proponents, in order to actually comply with section 11041, subdivision (b), must print the answer in the same typeface as the statement even if that requires alteration of the typeface used in the original answer.

Ruiz claims that construing section 11041, subdivision (b) to require a uniform typeface in the statement and answer would enable the recall election proponents to "edit" the answer. The term edit connotes an alteration of the content of the answer. However, permission to alter the typeface used in the answer, where it is inconsistent with the typeface used in the statement, is not tantamount to sanctioning the alteration of the content of the answer, which is neither required nor permitted under section 11041, subdivision (b).

There is no dispute that the Petitions do not actually comply with section 11041, subdivision (b), as we have construed it. The statements and answers were printed in disparate typefaces, which lack the uniformity required by the statute.

II. *The Petitions Substantially Comply with Purpose of Section 11041, Subdivision (b)*

The next issue is whether, under the doctrine of substantial compliance, the Petitions are valid despite the fact the entire statement was printed in bold type and the answer was printed in a combination of typefaces, including plain type, bold type, and underlined type.

" '[S]ubstantial compliance . . . means *actual* compliance in respect to the substance essential to every reasonable objective of the statute.' " (*Assembly v. Deukmejian* (1982) 30 Cal.3d 638, 649 [180 Cal.Rptr. 297, 639 P.2d 939], quoting *Stasher v. Harger-Haldeman* (1962) 58 Cal.2d 23, 29 [22 Cal.Rptr. 657, 372 P.2d 649].) The doctrine of substantial compliance, however, cannot save a petition that misinforms the voters or fails to inform the voters of information necessary to "exercise intelligently their rights . . . ." (*Creighton v. Reviczky* (1985) 171 Cal.App.3d 1225, 1232 [217 Cal.Rptr. 834].) Nor may it be "relied upon to save carelessly or negligently prepared petitions." (*California Teachers Assn. v. Collins* (1934) 1 Cal.2d 202, 205 [34 P.2d 134].) "[S]tatutes passed for the purpose of protecting electors from confusing or misleading situations should be

enforced." (*Clark v. Jordan* (1936) 7 Cal.2d 248, 252 [60 P.2d 457, ·106 A.L.R. 549].)

Even though the doctrine of substantial compliance is narrowly applied in the election context, our Supreme Court "has stressed that technical deficiencies in referendum and initiative petitions will not invalidate the petitions if they are in 'substantial compliance' with statutory and constitutional requirements." (*Assembly v. Deukmejian, supra,* 30 Cal.3d 638, 652.) The same rules have been applied to recall petitions. (See, e.g., *Othmer v. City Council of Long Beach* (1929) 207 Cal. 263, 275 [277 P. 857]; *Tilden v. Blood* (1936) 14 Cal.App.2d 407, 414 [58 P.2d 381].)

■■■ We conclude the Petitions substantially complied with the purpose of section 11041, subdivision (b). Although the Petitions do not actually comply with the literal language of section 11041, subdivision (b), they comply with the substance essential to every reasonable objective of the statute.

A. *The Purpose of Section 11041, Subdivision (b) Is to Assure Equal Emphasis of the Notice of Intention and the Answer*

The purpose of section 11041, subdivision (b), as indicated in the legislative history, is to ensure *equal emphasis* of the statement and the answer. The legislative history reflects the understanding that "[r]equiring all petition sections to be printed in uniform size and darkness would ensure that both the notice of intention (which includes the recall statement) and the officer's answer are given *equal emphasis* on the petition." (Off. of Sec. of State, Analysis of Assem. Bill No. 1455 (1983-1984 Reg. Sess.) June 9, 1983, p. 3, italics added.) The author of the legislation described the changes as "technical and procedural" and numerous other analyses similarly reflect that the legislation was technical and procedural. (See, e.g., Sen. Com. Elections & Reapportionment, Analysis of Assem. Bill No. 1455 (1983-1984 Reg. Sess.) as amended May 11, 1983 [bill provides for technical, clarifying, and procedural changes]; 3d reading analysis of Assem. Bill No. 1455 (1983-1984 Reg. Sess.) June 21, 1983, as amended May 11, 1983 [same].)

Because the legislative purpose to ensure equal emphasis of the statement and answer, the premise of Sylva's argument that "[t]he lack of *actual* compliance with the statute in this case defeats the statute's essential purpose—*to provide fair and balanced information to the voters*" is inaccurate. (Italics in original.) Simply put, section 11041, subdivision (b) does not govern the *information* provided to the voters, but governs only the *emphasis* that information receives in the petition.

The distinction between equal emphasis—the purpose of section 11041, subdivision (b) and balanced information—the purpose as characterized by Sylva—is critical. ▪ The failure to provide information or the communication of misinformation threaten the proper operation and the integrity of the election process. (*San Francisco Forty-Niners v. Nishioka* (1999) 75 Cal.App.4th 637, 642 [89 Cal.Rptr.2d 388].) No court has applied the doctrine of substantial compliance to save a petition that provides confusing or misleading information. (*Clark v. Jordan, supra,* 7 Cal.2d 248 [finding no substantial compliance where short title does not reveal initiative measure would affect taxes]; *Mervyn's v. Reyes* (1998) 69 Cal.App.4th 93, 104 [81 Cal.Rptr.2d 148] [omitting 17 pages of general plan section did not constitute substantial compliance]; *Hebard v. Bybee, supra,* 65 Cal.App.4th 1331 [no substantial compliance where title of ordinance in referendum petition was inaccurate]; *Ibarra v. City of Carson* (1989) 214 Cal.App.3d 90, 99 [262 Cal.Rptr. 485] ["[w]here the purpose of the statutory requirement is to give information to the public to assist the voters in deciding whether to sign or oppose the petition, the substantial compliance argument is often rejected and strict compliance held essential"]; *Creighton v. Reviczky, supra,* 171 Cal.App.3d 1225, 1231, 1338 [finding no substantial compliance where proponents increased confusion by excluding test of protested legislation].)

In contrast, the doctrine of substantial compliance has been applied where only the emphasis of the information presented is at issue. For example, in *California Teachers Assn. v. Collins* (1934) 1 Cal.2d 202 [34 P.2d 134], the registrar of voters refused to accept a petition because, in part, the short title was printed in 12-point instead of 18-point type, when section 1197b of the Political Code required that " 'across the top of each page after the first page of every initiative . . . petition or section thereof . . . there shall be printed in eighteen-point gothic type a short title . . . .' " (*California Teachers Assn.,* at pp. 203-304.) The Supreme Court found "[i]n actual size there is a difference of but six-seventy-seconds of an inch. Only one with very poor eyesight would be unable to read a line printed in twelve-point type as readily as one printed in eighteen-point type." (*Id.* at p. 204.) "[W]e are of the view there has been a sufficiently substantial compliance with the statute to require him to accept and file the petition." (*Ibid.*; see also *Othmer v. City Council of Long Beach* (1929) 207 Cal. 263, 270 [277 P. 857] [finding substantial compliance where "there was nothing in the duplicate copies of the petition to mislead the electors, and there can be no doubt that each signer fully understood that he was signing a petition for the recall of the four councilmen"]; *Chase v. Brooks* (1986) 187 Cal.App.3d 657, 664 [232 Cal.Rptr. 65] [finding caption to be in substantial compliance with requirements].)

One reason to distinguish between information and emphasis when applying the substantial compliance doctrine is that only the latter is necessarily

content neutral. Where the information is mischaracterized the electorate is misled, and the voter is unable to intelligently exercise his or her right to vote, the "sword of democracy." (*San Francisco Forty-Niners v. Nishioka, supra,* 75 Cal.App.4th at p. 643.) On the other hand, where the only defect is that the typeface is not in strict compliance with the Elections Code, the voter may still be able to intelligently exercise his or her right to vote. (See *California Teachers Assn. v. Collins, supra,* 1 Cal.2d 202.) "The law is clear that election officials have a ministerial duty to reject initiative petitions which suffer from a substantial, as opposed to a technical, statutory defect which directly affects the quality of information provided to the voters." (*San Francisco Forty-Niners v. Nishioka, supra,* 75 Cal.App.4th at p. 644.)

A review for content is antithetical to analyzing substantial compliance in this case because the issue is emphasis, not information. Nevertheless, reviewing the content of the Target Officials' answers demonstrates a second fallacy of Sylva's argument. Sylva argues that actual compliance is necessary to ensure the communication of balanced information. That argument assumes that the answer presents information, i.e. a position informing the voters of the desirability of a recall election.

Contrary to Sylva's assumption, the answers contain no information regarding the desirability or merits of a recall election. Consequently, as the Secretary of State points out, "[i]n the particular circumstances of this case . . . where the Answers do not address the merits of the Notice of Intention, the type size and darkness are totally irrelevant." Even if the purpose of section 11041, subdivision (b) were as Sylva characterized it—to provide fair and balanced information—she cannot demonstrate that the information presented was imbalanced because the Target Officials provided no competing position vis-à-vis the merits of the recall election.

B. *The Proponents Substantially Complied with the Essence of Section 11041, Subdivision (b)*

The real issue is whether the use of disparate typeface created an undue emphasis of the Proponents' statement compared to the Target Officials' answers. The Target Officials argue that " 'Substantial compliance' cannot achieve the equality required by the Legislature." The trial court, in contrast, found the bold print in the statement "balance[s] out" with the combination of plain, bold, and underlining used in the answers.

We have reviewed independently the copies of the Petitions included in the record and agree with the trial court's analysis. (See *Hernandez v. City of*

*Encinitas* (1994) 28 Cal.App.4th 1048, 1058 [33 Cal.Rptr.2d 875] [substantial compliance is a question of law].) The typeface used in the statement appears to be substantially the same as that used in the answers. While the statement is slightly darker, the difference is minute. Despite the slight discrepancy, the use of selective emphasis in the answers including the use of bold type, underline type, and plain type, "balance[s] out" the use of bold type in the statement. Stated otherwise, the statements and answers appear equally emphasized; neither is minimized in comparison to the other.

The Target Officials argue "the statement of grounds for the recalls . . . were printed entirely in boldface type, which increased the physical size of the print, as compared to the answers of the officials sought to be recalled . . . which were printed almost entirely in ordinary type and darkness." To better evaluate the Target Officials' claim that the typeface used for the statement was larger and therefore more prominent, we measured the word "You" contained in both the statement and in the answers was measured. While there was a difference in size between the bold type in the statement and the plain type in the answers, the difference was less than one millimeter in length. This difference is de minimis. The essence of the statutory requirement—equal emphasis—has been satisfied, notwithstanding the slight variation in color and the insubstantial variation in size. There is no evidence that a voter reviewing the petition would be drawn to the statement because of the typeface used. Although the Petitions did not actually comply with the requirements of section 11041, subdivision (b), the petitions substantially complied with that statute.

Substantial compliance is sufficient. It is the test reaffirmed in *Assembly v. Deukmejian, supra,* 30 Cal.3d 638, and routinely applied in the election context. (See, e.g., *Hebard v. Bybee, supra,* 65 Cal.App.4th at p. 1339; *Ibarra v. City of Carson, supra,* 214 Cal.App.3d at p. 99; *Myers v. Patterson, supra,* 196 Cal.App.3d at pp. 137-139.) In addition, it is consistent with the approach employed by the Secretary of State to permit, on rare occasions, the proponents of a recall election to alter the presentation of the answer without altering the content of the answer. Actual compliance with the literal language of the statute is not necessary to save the petitions.

While the doctrine of substantial compliance remains viable, its application requires caution. " 'Substantial compliance' may be carried too far, in which case its application may not be relied upon to save carelessly or negligently prepared petitions." (*California Teachers Assn. v. Collins, supra,* 1 Cal.2d at p. 205.) The circumstances of this case warrant application of the doctrine because the technical violations are de minimis, and no evidence reveals the Proponents sought to manipulate the process in order to obtain an

unfair advantage by deemphasizing the answers. Instead, the Proponents printed the answers exactly as they were drafted and neither the statements nor the answers were unduly emphasized.

### III.   *Avalos's Purported Rescission Letter Does Not Render Signatures Collected on the Petitions After December 10, 2001, Invalid*

Sylva argues that this court should hold the signatures collected after December 10, 2001, are invalid because, on that date, Avalos informed the Proponents that the petitions were invalid. There is no basis to reach the conclusion requested by Sylva. The signatures were collected on valid Petitions after the Petitions were approved by the election official. The Elections Code requires nothing more. (§ 11042, subd. (d).)

First, the Petitions were valid because they substantially comply with section 11041, subdivision (b). The Target Officials implicitly recognized this when they prepared their answers because, at that time, they had been personally served with copies of the Petitions that included the statements, which were printed in bold. The Target Officials could have chosen to print their answers in the same bold type. Instead, they chose to emphasize selectively only certain words.

Second, Avalos recognized that the Petitions substantially complied with section 11041, subdivision (b) when she approved the Petitions. (§ 11042, subd. (a).) An election official has a "ministerial duty to reject initiative petitions which suffer from a substantial, as opposed to a technical, statutory defect." (*San Francisco Forty-Niners v. Nishioka, supra*, 75 Cal.App.4th at p. 644.) Avalos was not required to reject the petitions because the defect was a minor technical defect, not a substantial statutory defect. The technical violation did not result in the presentation of confusing or misleading information.

Finally, once Avalos approved the Petitions, the Proponents were authorized under the Elections Code to collect signatures. (§ 11042, subd. (d).) Accordingly, we reject Sylva's request that this court invalidate any portion of those signatures.

### DISPOSITION

The grant of the Proponents' petition for mandate is affirmed (No. B157433). The denial of the Target Officials' petition for mandate is likewise affirmed (No. B157803). The approval of the form and the wording of the Petitions is final. The Petitions are deemed to have been timely filed. The

"intermediate steps in the recall" as codified in section 11101 et seq. shall commence immediately upon the issuance of this court's remittitur.

Rubin, J., and Boland, J., concurred.

The petition of appellant Julia Sylva for review by the Supreme Court was denied November 26, 2002.